FILED

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MAR 0 4 2009

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
　　　　　DEPUTY CLERK

| | |
|---|---|
| STEPHEN KING, Derivatively and on Behalf of ARTHROCARE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL A. BAKER, DAVID F. FITZGERALD, JAMES G. FOSTER, PETER L. WILSON, TORD B. LENDAU, BARBARA D. BOYAN, TERRENCE E. GEREMSKI, MICHAEL T. GLUK, RICHARD A. CHRISTENSEN, JOHN H. GIROUX, SR., JOHN T. RAFFLE, FERNANDO V. SANCHEZ, MICHAEL MOEHRING, MICHAEL DENKER, DAVID APPLEGATE, JERRY P. WIDMAN, and PRICEWATER-HOUSECOOPERS, LLP, <br><br> Defendants, <br><br> and <br><br> ARTHROCARE CORPORATION, <br><br> Nominal Defendant. | Case No. A09CA 162SS |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 1 -

## **TABLE OF CONTENTS**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT ......................................1

I.   INTRODUCTION AND OVERVIEW OF THE ACTION. ....................................1

    A.   Introduction of the Action...........................................................................1

    B.   Overview of the Action................................................................................3

II.  JURISDICTION AND VENUE. ...........................................................................8

III. PARTIES. ...............................................................................................................8

    A.   Plaintiff. .......................................................................................................8

    B.   Nominal Defendant.......................................................................................9

    C.   Individual Defendants. .................................................................................9

    D.   Independent Auditor Defendant.................................................................18

IV.  FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS.......................20

    A.   Duties of the Individual Defendants. .........................................................20

    B.   Duties of the Audit Committee. .................................................................25

    C.   Duties of the Compensation Committee. ...................................................27

    D.   Duties of the Governance Committee.........................................................28

V.   THE INDIVIDUAL DEFENDANTS BREACHED THEIR DUTIES. .................29

    A.   ArthroCare's Business. ..............................................................................29

    B.   The Individual Defendants Base the Company's Growth Upon a
         Singular and Suspect Increase in Sales of Spinal Surgery Devices...........29

    C.   The Individual Defendants Fail to Maintain Adequate Controls that
         Properly Recognize Revenue. ....................................................................31

    D.   The Individual Defendants Allow ArthroCare to Engage in
         Improper Financial Reporting and GAAP Violations During the
         Relevant Period. .........................................................................................34

    E.   The Individual Defendants Disseminate Materially False and
         Misleading Statements About the Company During the Relevant
         Period. .........................................................................................................38

VI.    CONSPIRACY, AIDNG AND ABETTING AND CONCERTED ACTION. ........................................................................59

VII.    THE TRUTH EMERGES CONCERNING ARTHROCARE'S ACTUAL FINANCIAL AND OPERATIONAL CONDITION. ...........................61

VIII.    THE INDEPENDENT AUDITOR'S REPORTS WERE MATERIALLY FALSE AND MISLEADING.................................................................70

IX.    INSIDER TRADING.........................................................................75

X.    DERIVATIVE ALLEGATIONS........................................................80

XI.    DEMAND FUTILITY. ......................................................................81

COUNT I .....................................................................................................88

COUNT II ....................................................................................................89

COUNT III ...................................................................................................91

COUNT IV ...................................................................................................92

COUNT V ....................................................................................................93

COUNT VI ...................................................................................................94

COUNT VII ..................................................................................................95

COUNT VIII .................................................................................................96

COUNT IX ...................................................................................................97

COUNT X ....................................................................................................97

PRAYER FOR RELIEF .................................................................................98

JURY DEMAND.........................................................................................100

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant ArthroCare Corporation ("ArthroCare") against certain directors and officers of ArthroCare named herein (the "Individual Defendants"). Plaintiff bases his allegations on actual knowledge as to his own acts and on information and belief as to all other allegations after due investigation, including, without limitation: (a) review and analysis of public filings made by ArthroCare and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on ArthroCare's website concerning the Company's public statements; (d) review of other publicly available information concerning ArthroCare and other persons; and (e) allegations and the contents of interviews with factual sources set forth in the amended complaint in *McIlvaine v. ArthroCare Corp.*, No. 1:08-cv-00863-SS, pending in this Court.

**I.     <u>INTRODUCTION AND OVERVIEW OF THE ACTION.</u>**

     **A.     Introduction of the Action.**

1.     This is a shareholder derivative action brought by shareholders of ArthroCare on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of the Sarbanes-Oxley Act of 2002 ("SOX") and the Securities Exchange Act of 1934 (the "Exchange Act"), and breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between March 31, 2000 and February 18, 2009 (the "Relevant Period") and that have caused substantial losses to ArthroCare and other damages, including irreparable damages to its reputation and goodwill. On behalf of ArthroCare, this action seeks damages, corporate governance

1

reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of state and federal law.

2.    ArthroCare manufactures and markets surgical devices for use in soft-tissue surgery. The Company's devices are primarily used in three areas of treatment:  (i) spinal surgery; (ii) sports medicine; and (iii) ear, nose & throat ("ENT") surgery.  The Company's three principal business units—the Spine Unit, the Sport Medicine Unit, and the ENT Unit—reflect these divisions.

3.    During the Relevant Period, ArthroCare lacked adequate internal controls with regard to the Company's business and accounting practices and financial reporting.  These internal control issues included, among other things: (i) improper description of and manipulation of intercompany relationships; (ii) improper recognition of sales and sales commissions, including but not limited to a lack of monitoring and control of sales prices; (iii) allegedly illegal practices related to the "upcoding" of third-party insurance benefits.[1]

4.    As a result of these and other deficiencies, the Company not only is being required to restate *over eight years* of financial statements (for the years ended December 31, 2000 through December 31, 2007 and the first quarter of 2008 ended March 31, 2008), but also is currently the subject of a formal investigation by the SEC.  Moreover, the Company is the subject of investigations by the United States Attorney's offices in South Carolina and Florida, and the Federal Bureau of Investigation ("FBI") has initiated a probe into the Individual Defendants' "DiscoCare" scheme for possible criminal law violations.

---

[1] Hospitals, doctors and other health care providers use a standardized system of numerical codes for the treatment they provide.  "Upcoding" is commonly defined as the misuse of these standardized codes to obtain more money than is allowed by law or contract.

B.     **Overview of the Action**

5.      While the Company's Sports Medicine and ENT Units have seen modest growth that is commensurate with industry averages, ArthroCare's Spine Unit recently experienced explosive growth, ***including a 95% increase in sales of the Company's spinal devices from 2006 to 2007.***

6.      This phenomenal increase was due, in large part, to the sales of the Company's spinal surgery devices through its purported "distributor" DiscoCare, Inc. ("DiscoCare"). But while the Individual Defendants continually caused the Company to refer to DiscoCare as a traditional distributor[2] which possessed an algorithm that allowed it to get insurance company approval for Plasma Disc Decompression (PDD) procedures, the true relationship between ArthroCare and DiscoCare, only belatedly disclosed in a July 21, 2008 press release, was that of ***sales agent***. The difference is not just a semantic one, but affects how, when, and whether sales through DiscoCare can be booked as revenues in the Company's financial statements—and therefore the profitability and perceived value of the Company in the marketplace.

7.      Moreover, in the July 21, 2008 press release, the Individual Defendants also were compelled to acknowledge that the Company had been improperly recognizing sales of its products. Specifically, and in relevant part, the press release revealed as follows:

> ArthroCare Corp (Nasdaq: ARTC) announced today that it will restate its financial statements for the years ended December 31, 2006 and 2007, the quarters ended September 30, 2006, December 31, 2006, each of the quarters of 2007 and the quarter ended March 31, 2008 as a result of the determination by the Audit Committee of the Board of Directors on July 20, 2008 that the financial statements for such periods can no longer be relied upon. ***The restatement follows a recommendation by management that revenue in these previously issued financial statements should be adjusted because: the relationship between the Company and DiscoCare, Inc. during the periods being restated was a sales agent relationship,***

---

[2] Defendants alternatively referred to DiscoCare as "a key third-party billing and reimbursement service provider." Conference Call, January 3, 2008.

*rather than that of a traditional distributor; and that the sales price of products sold to State of the Art Medical Products, Inc. ("SOTA"), Boracchia & Associates and Clinical Technologies, Inc. cannot be considered fixed or determined upon shipment by ArthroCare during the periods to be restated.* [Emphasis added.]

8.     As the true facts emerged, it became clear that although Defendants had caused ArthroCare to recognize sales of Spine Unit products upon *shipment, even though medical providers and other customers were not being charged for those products at the time*—in direct violation of longstanding accounting protocols.  In lieu of payment, the Company was caused to accept *indefinite rights to collect from various third parties*.

9.     Two forms of such contingent billing predominated at ArthroCare:  either (1) an assignment to the Company of the right to bill private third-party insurance companies for the devices, or (2) a letter of protection from any attorney handling a personal injury case for the patient.  The letter of protection would allow the Company to receive payment for the device from the proceeds of any settlement of the patient's personal injury case.  Accordingly, ArthroCare's "sales" of its spinal surgery devices were not unconditional and could not properly be recognized upon shipment, but instead were highly contingent on the actions and decisions of *outsiders to the sales transactions*.

10.     Further instances of the Individual Defendants' pattern of false accounting practices came to light on December 19, 2008, when the Company announced that the period for which it would restate financial results had expanded to *over eight years*, that the accounting improprieties had involved not just the Spine Unit but also Sports Medicine and ENT, and that certain of the Defendants had resigned for their roles in the improprieties.

11.     Finally, on February 18, 2009, the other shoe dropped.  On that day, ArthroCare's Audit Committee announced that it had found evidence of widespread abuses at ArthroCare related to Spine Unit billing practices—so much so that the committee determined to take action even before

4

the review was complete, calling upon defendants Baker (ArthroCare's CEO), Moehring, and Denker to resign immediately.

12.     At the same time, the Company announced that the SEC announced that its then-informal investigation of ArthroCare had been converted into a formal proceeding—giving the SEC power to subpoena witnesses and documents.

13.     As a result of these belated disclosures, the Company's value has been eviscerated, as its market capitalization fell about 65 percent from the Relevant Period high of $65 per share when the Defendants were finally forced to reveal the truth on July 20, 2008.  As of today's date, ArthroCare's market capitalization has fallen by $1.61 billion—or 93 percent.  The stock closed at approximately $4.50 per share on February 18, 2009.

14.     Thus, in this case, the true facts which the Individual Defendants, the officers and directors of ArthroCare, knew, consciously ignored, or were reckless in not knowing, included:

(a)     the Company lacked requisite internal controls, and, as a result, its historical results and projections were based upon defective assumptions and manipulated facts and had no reasonable basis in fact;

(b)     the Company's financial statements were materially misstated due to the improper recognition of "sales" and "sales commissions";

(c)     The Board of Directors, including its Audit Committee, and the Company's supposedly independent outside audit firm abdicated their duties to monitor and control ArthroCare's audit systems, controls and procedures;

(d)     the Company's financial statements were materially misstated due to conscious failure to supervise, or exert internal controls over, Company's spinal products division; and

5

(e)     the Company's revenues and income were overstated, and its financial statements during the Relevant Period were materially false and misleading and not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

15.     As a result of the Individual Defendants' dereliction of their most basic duties, crucial information concerning the Company's true financial information was withheld from the marketplace.  Thus, throughout the Relevant Period, ArthroCare's stock price traded at inflated levels, allowing certain defendants to reap tens of millions of dollars in ill-gotten bonuses and proceeds from stock sales based on material, non-public information.  In particular, various defendants reaped over $30 million in illicit sales of Company stock.  Further, a number of defendants were unjustly enriched as a result of receiving bonuses that were based on the Company's financial performance relative to internal targets.  These defendants would have received substantially lower cash bonuses—and in most cases no bonus at all—had ArthroCare's performance relative to the internal targets been measured by the Company's actual financial results as reflected in the true results to be contained in its restated results.

16.     As a result of the Individual Defendants' improprieties in financial accounting, the Company has expended, and will need to expend, significant sums of money, including the following:

(a)     costs incurred in connection with the SEC's investigation;

(b)     costs incurred in connection with the FBI probe and investigations by United States Attorneys in two jurisdictions;

(c)     costs incurred defending ArthroCare and certain officers and directors in shareholder class actions;

6

(d)     costs incurred from directing manpower to restate the Company's prior financial results to correct for improper recognition of "sales" and "sales commissions";

(e)     costs incurred from directing manpower to correct the Company's defective internal controls, including, but not limited to, costs incurred in lost productivity as the attention of directors, officers and employees is diverted from normal Company business to the issues raised by various investigations (and potential investigations), litigation, and related negative publicity;

(f)     potentially tens of millions of dollars in settlements to satisfy adverse judgments, civil penalties, settlements, and other liabilities;

(g)     costs incurred from increased Directors' and Officers' Insurance ("D&O Insurance") premiums as a result of the improper financial and manipulated sales results;

(h)     costs incurred from potential losses of customers who do not want to be associated with a business that increases sales through manipulation of health and casualty insurers and the legal system;

(i)     costs of potential downgrades of ArthroCare's debt and securities by financial analysts and creditors, due to concerns about the Company's financial reporting; and

(j)     irreparable damage to the Company's corporate image and goodwill inasmuch as, for at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in improper behavior and have misled the investing public. Because of the "liar's discount," investors and lenders are less likely to give ArthroCare equity capital or loans on favorable terms in the future.

## II.    JURISDICTION AND VENUE.

17.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under SOX and the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

18.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## III.   PARTIES.

### A.    Plaintiff.

20.    Plaintiff Stephen King is a holder of ArthroCare common stock and a citizen of California.

**B.      Nominal Defendant.**

21.      Nominal defendant ArthroCare is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 1111 Congress Avenue, Suite 510, Austin, Texas.

**C.      Individual Defendants.**

22.      Michael A. Baker ("Baker") is a citizen of Texas.  Baker has been a director, President and Chief Executive Officer ("CEO") of ArthroCare since July 1997.  Baker was forced to resign as President and CEO on February 18, 2009.  Prior to joining ArthroCare, Baker was a Vice President at Medtronic, Inc.  Because of Baker's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Baker participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings.  During the Relevant Period, Baker sold 297,945 shares of his personally held shares of ArthroCare stock for proceeds of $15,270,926, constituting over 100 percent of his personal holdings of Company stock as of the date of first sale, while in possession of the material, non-public information about the Company's accounting and internal control problems.

23.      Defendant David F. Fitzgerald ("Fitzgerald") is a citizen of Texas.  He has been a director of ArthroCare since April 2003.  Fitzgerald, age 75, is the acting CEO of ArthroCare. Fitzgerald spent 25 years in management positions at Pfizer, Inc., and serves on the boards of

LifeCell Corporation and Orthovita, Inc. Fitzgerald has been a member of the Audit Committee of ArthroCare since 2003. Because of Fitzgerald's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Fitzgerald participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. Fitzgerald received over $167,632 in fees and other compensation from ArthroCare in 2007.

24.    Defendant James G. Foster ("Foster") is a citizen of Minnesota. Foster has been a director of ArthroCare since August 2002. Foster held several high-level officer positions at Medtronic, Inc. between 1984 and 2001, and he sits on the Board of LifeCell Corporation. Because of Foster's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Foster participated in the issuance of improper statements about ArthroCare, including the preparation of

improper press releases and SEC filings. Foster received over $125,168 in fees and other compensation from ArthroCare in 2007.

25. Defendant Peter L. Wilson ("Wilson") is a citizen of Connecticut. Wilson has been a director of ArthroCare since June 2001. Wilson is the Lead Director of the Board. He currently sits on the Board of Conceptus, Inc. Wilson has been a member of the Audit Committee of ArthroCare since 2001. Because of Wilson's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Wilson participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. Wilson received over $141,835 in fees and other compensation from ArthroCare in 2007.

26. Defendant Tord B. Lendau ("Lendau") is a citizen of Texas. Lendau has been a director of ArthroCare since June 2001. Previously, he was affiliated with a number of companies, including Medtronic, Inc., serving as a Vice President of Medtronic/Synectics from 1996 to 1997. Lendau is a member of the Audit Committee of ArthroCare since July 2007. Because of Lendau's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal

11

corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. Lendau received over $126,002 in fees and other compensation from ArthroCare in 2007.

27.     Defendant Barbara D. Boyan ("Boyan") is a citizen of Georgia. Boyan has been a director of ArthroCare since March 2005. Boyan is a professor at Georgia Tech and Emory University. Because of Boyan's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Boyan participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. Boyan received over $315,882 in fees and other compensation from ArthroCare in 2007.

28.     Defendant Terrence E. Geremski ("Geremski") is a citizen of Florida. Geremski has been a director of ArthroCare since December 2006. He is a former high-level officer of Carpenter Technology Corporation. Geremski is the Chair of the Audit Committee of ArthroCare, and has sat on the committee since 2006. Because of Geremski's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and

present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Geremski participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. Geremski received over $167,315 in fees and other compensation from ArthroCare in 2007.

29.     Defendant Michael T. Gluk ("Gluk") is a citizen of Texas. Gluk was Senior Vice President and Chief Financial Officer ("CFO") of ArthroCare from 2004 until December 19, 2004, when he resigned amidst the growing accounting scandal at the Company. Because of Gluk's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Gluk participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. During the Relevant Period, Gluk also sold approximately 21,000 shares of his personally held shares of ArthroCare stock for proceeds of $1,038,807 while in possession of the material, non-public information about the Company's accounting and internal control problems.

30.     Defendant Richard A. Christensen ("Christensen") is a citizen of Texas. Christensen has been the Senior Vice President, Operations, of ArthroCare since August 2002 and was Administrative Manager for ArthroCare Costa Rica SRL. Because of Christensen's positions, he

knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Christensen participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. During the Relevant Period, Christensen also sold 29,737 shares of his personally held shares of ArthroCare stock for proceeds of $1,088,727 while in possession of the material, non-public information about the Company's accounting and internal control problems.

31.     Defendant John H. Giroux, Sr. ("Giroux") is a citizen of Texas. Giroux has been the President, ArthroCare Sports Medicine since November 2004 and Senior Vice President, Surgical Business Unit of ArthroCare since October 2002. Because of Giroux's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Giroux participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. During the Relevant Period, Giroux also sold 208,686 shares of his

14

personally held shares of ArthroCare stock for proceeds of $8,530,553 while in possession of the material, non-public information about the Company's accounting and internal control problems.

32.    Defendant John T. Raffle ("Raffle") is a citizen of Texas.  Raffle was the Senior Vice President of Strategic Business Units at ArthroCare before he resigned on December 19, 2009 amidst the growing accounting scandal at the Company.   Because of Raffle's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Raffle participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings.  During the Relevant Period, Raffle also sold 56,440 shares of his personally held shares of ArthroCare stock for proceeds of $4,173,158 while in possession of the material, non-public information about the Company's accounting and internal control problems.

33.    Defendant Fernando V. Sanchez ("Sanchez") is a citizen of Texas. Sanchez has been the Senior Vice President, Business Development at ArthroCare since March 2002.  Sanchez has also previously served as CFO of the Company during the Relevant Time Period Because of Sanchez's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Sanchez participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings. During the Relevant Period, Sanchez also sold 3,175 shares of his personally held shares of ArthroCare stock for proceeds of $351,000 while in possession of the material, non-public information about the Company's accounting and internal control problems.

34.     Defendant Michael Moehring was the Vice President and General Manager of ArthroCare's spine unit, until his resignation on February 18, 2009. Moehring is a citizen of Ohio. Because of Moehring's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Moehring participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings.

35.     Defendant Michael Denker was ArthroCare's director of sales development and training until his resignation on February 18, 2009. Denker is a citizen of Florida. Because of Denker's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of

ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

36.     Defendant David Applegate was Senior Vice President and General Manager of ArthroCare's Spine Unit until December 19, 2008, when he resigned amidst the growing accounting scandal at the Company.  Applegate is a citizen of Texas.  Because of Applegate's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Applegate participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings.

37.     Defendant Jerry P. Widman was a director of the Company until 2007.  He became a director.  From 1982 to 2001, Widman served as the Chief Financial Officer of Ascension Health, a large U.S. not-for-profit multi-hospital system. Widman currently serves as a member of the board of directors and the audit committee of United Surgical Partners International, Inc., a publicly-traded ambulatory surgery centers company, Cutera, Inc., a publicly-traded laser and other light-based products company, and The TriZetto Group, Inc., a publicly-traded company in the healthcare

information technology business. Widman is a Certified Public Accountant. He was a member of the Audit Committee from 2003 through June 2007. Widman is a citizen of Florida. Because of Widman's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, of the adverse, non-public information about the business of ArthroCare set forth herein, including its accounting irregularities, internal control problems, and overstatement of revenue, finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Relevant Period, Widman participated in the issuance of improper statements about ArthroCare, including the preparation of improper press releases and SEC filings.

38.    The defendants named in paragraphs 22-37 above are referred to herein as the "Individual Defendants." The defendants named in paragraphs 22-28 and 37 above are referred to herein as the "Director Defendants." The defendants named in paragraphs 22 and 29-36 above are referred to herein as the "Officer Defendants."

### D.    Independent Auditor Defendant

39.    At all times during the Relevant Period, defendant PriceWaterhouseCoopers, LLP ("PWC") served as the Company's Independent Certified Public Accountants and Auditors. In this capacity, defendant PWC audited the Company's financial statements, results of operations and the balance sheet, and provided a yearly report that certified that the financial results were true, accurate and reliable and prepared in conformity with Generally Accepted Accounting Principles. In fact, contained in each of the Company's annual reports filed with the SEC during the Relevant Period, PWC stated, "In our opinion, the consolidated financial statements referred to above present fairly,

in all material respects, the financial position of ArthroCare Company and subsidiaries," or a statement to substantially identical effect.

40.     In addition to the foregoing, because of PWC's position with the Company, it had access to the adverse undisclosed information about ArthroCare's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

41.     ArthroCare and its shareholders were willing to, and did, pay millions of dollars in audit and non-audit fees to PWC to compensate it for conducting a purported significant "due diligence" investigation into the Company, in connection with the Annual Reports. PWC's due diligence investigation was a critical component of the Company's Annual Report, and this was supposed to provide shareholders with important safeguards and protections.

42.     The due diligence investigation that was required of PWC included a detailed investigation into ArthroCare's sales, accounting, controls, and procedures, and it also required the PWC to test the assumptions and verify the projections adopted or ratified by the Individual Defendants, the Audit Committee or the Board, to the extent a reasonable investor with access to such confidential corporate information would have done so. A reasonable due diligence investigation would have extended well beyond a mere casual view of ArthroCare's books and records, and its accounting, financial report and operational and financial controls. The failure of PWC to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

## IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS.

### A.   Duties of the Individual Defendants.

43.   The Individual Defendants had stringent duties to ArthroCare and its shareholders.

44.   By reason of their positions as officers, directors and/or fiduciaries of ArthroCare and because of their ability to control the business and corporate affairs of ArthroCare, the Individual Defendants owed ArthroCare and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage ArthroCare in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ArthroCare and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45.   Each director and officer of the Company owes to ArthroCare and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

46.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of ArthroCare, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with ArthroCare, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of ArthroCare.

20

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ArthroCare, and was at all times acting within the course and scope of such agency.

48.     To discharge their duties, the officers and directors of ArthroCare were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of ArthroCare were required to, among other things:

(a)     refrain from acting upon material, inside, corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     ensure that the Company's financial statements were based on appropriate support and documentation, and were routinely checked for accuracy;

(f)     ensure that financial records could not be manipulated;

21

      (g)     remain informed as to how ArthroCare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

      (h)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

      (i)     ensure that these were sufficient checks and balances in ArthroCare's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue; and

      (j)     ensure that no inaccurate financial information about ArthroCare was released to the public that would tend to artificially inflate ArthroCare's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ArthroCare, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. The Individual Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant

Period has been ratified by the remaining Individual Defendants who collectively comprised all of ArthroCare's Board during the Relevant Period.

50.     In addition, the Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required the Individual Defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

51.     The Individual Defendants also had specific duties imposed on them by the Company.

52.     ArthroCare adopted "Corporate Governance Guidelines" to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.  Among other things, the Corporate Governance Guidelines provided that the Director Defendants had "have complete access to Company management in order to ensure that directors can ask any questions and receive all information necessary to perform their duties."

53.     The Guidelines specified that "[e]ach director is expected to spend the time and effort necessary to properly discharge his or her responsibilities," which include:

1.  Overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

2. reviewing and, where appropriate, approving the Company's major strategic direction, financial objectives, plans and actions;

3. reviewing and, where appropriate, approving major changes in, and determinations of other major issues respecting, the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

4. reviewing and, where appropriate, approving major changes in, and determinations under the Company's Guidelines, Code of Business Conduct and Ethics and other Company policies;

5. reviewing and, where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any businesses or asset(s) material to the Company or the entry of the Company into any major new line of business;

6. regularly evaluating the performance and approving the compensation of the CEO;

7. reviewing the CEO's evaluation of the performance of principal senior executives;

8. planning for succession with respect to the position of CEO and monitoring management's succession planning for other key executives; and

9. ensuring that the Company's business is conducted with the highest standards of ethical conduct and in conformity with any and all applicable laws and regulations.

54.    The Guidelines also required the Director Defendants to "avoid any actions, positions or interests that conflict with the interests of the Company or give the appearance of a conflict"; to "annually establish the performance criteria (including both long-term and short-term goals) to be considered in connection with the CEO's next annual performance evaluation."

55.    ArthroCare also had a "Code of Conduct" applicable to the entire Company, including the Individual Defendants, which states in part:

**ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS**

**The Company's mission includes significant efforts to promote ethical conduct in the practice of financial management throughout our Corporation. Senior financial officers hold an important and elevated role in corporate governance. While members of the management team, they are uniquely capable and empowered to ensure that all stakeholders' interests are appropriately balanced, protected and preserved.**

We are a public company and are required to report our financial results and a great deal of financial and other information about our business to the public and the Securities and Exchange Commission. We are also subject to various securities laws

and regulations. It is our policy to promptly disclose accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and cause legal liability.

Employees should be on guard for, and promptly report, evidence of improper financial reporting. Examples of suspicious activities that should be reported include:

- ***Financial results that seem inconsistent with the performance of underlying business transactions;***

- Inaccurate Company records, such as overstated expense reports, or erroneous time sheets or invoices;

- Transactions that do not seem to have a good business purpose; and

- Requests to circumvent ordinary review and approval procedures. [Last emphasis added.]

56.     In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Individual Defendants sitting on those Committees.  These duties are highlighted below.

**B.     Duties of the Audit Committee.**

57.     The Audit Committee currently comprises the following defendants: Fitzgerald, Lendau and Geremski.  Geremski is the Chair of the Audit Committee.

58.     The purpose of the Audit Committee is

to oversee the accounting and financial reporting processes of ArthroCare Corporation and the audits of the Company's financial statements including, but not limited to, oversight responsibilities regarding: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor.

59.     The Charter of the Audit Committee contains specific areas of responsibility, including:

- "The Committee shall be directly responsible and have sole authority for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or

performing other audit, review or attest services for the Company. The independent auditor shall report directly to the Committee";

- "The Committee shall meet with management, the independent auditor and the internal auditor to discuss the scope of the audit, the procedures to be followed and the staffing of the audit";

- "The Committee shall review and discuss with management and the independent auditor: (A) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements";

- "The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- "The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- "The Committee shall discuss with management and the independent auditor, the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies";

- "The Committee shall discuss with management and the independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function"; and

- "The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualifications, performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board."

60.    The Audit Committee met nine times during 2006 and 10 times during 2007.

**C.    Duties of the Compensation Committee.**

61.    The Compensation Committee currently comprises the following defendants: Boyan,

Wilson, and Fitzgerald.  Fitzgerald is the Chair of the Compensation Committee.

62.    The purpose of the Compensation Committee is

to (a) review and make recommendations to the Board of Directors regarding all
forms of compensation to be provided to the executive officers and employees of the
Company, (b) discharge the Board of Directors' responsibilities relating to
compensation of the Company's executives, including by designing (in consultation
with management or the Board of Directors), recommending to the Board of
Directors for approval, and evaluating the compensation plans, policies and programs
of the Company and (c) produce an annual report on executive compensation for
inclusion in the Company's proxy materials in accordance with applicable rules and
regulations.  The Committee's policy is to ensure that senior management will be
accountable to the Board of Directors through the effective application of
compensation policies applicable to the Company's executive officers, including
performance goals and stock and incentive compensation, to attract and retain key
management talent, to support the achievement of the Company's business strategies
through the establishment of appropriate compensation components and to ensure the
integrity of the Company's compensation and benefit practices and safeguard the
interests of the Company's stockholders.

63.    The Charter of the Compensation Committee contains specific areas of responsibility,

including:

- "Reviewing and making recommendations to the Board of Directors regarding
the compensation policy for executive officers of the Company, and such other
officers of the Company as directed by the Board of Directors";

- "Annually reviewing and approving for the Company's executive officers, and
such other officers of the Company as directed by the Board of Directors, as
applicable: (i) annual base salary, (ii) annual bonus, (iii) long-term incentive
compensation (either cash-based, equity-based or otherwise), (iv) any
employment or severance agreements, (v) any change-in-control agreements
and/or change-in-control provisions affecting any elements of compensation and
benefits, and (vi) any other perquisites or other supplemental benefits";

- "Reviewing and making recommendations to the Board of Directors regarding
general compensation goals and guidelines for the Company's employees and the
criteria by which bonuses to the Company's employees are determined";

- "Reviewing and making recommendations to the Board of Directors regarding
other plans that are proposed for adoption or adopted by the Company for the
provision of compensation to employees of, directors of and consultants to the

Company, including any cash compensation and equity participation for non-employee members of the Board of Directors"; and

- "The Committee Chair should report regularly to the Board of Directors in executive session on the Committee's activities, issues, and concerns, including an annual review of the Committee's performance in relation to its charter. Not less than annually, the Committee shall report to the Board of Directors regarding the CEO's performance and compensation, as well as compensation for the other executive officers."

64.     The Compensation Committee met 10 times during 2006 and five times during 2007.

**D.     Duties of the Governance Committee.**

65.     The Nominating and Corporate Governance Committee ("Governance Committee") currently comprises the following defendants:  Wilson, Boyan, and Foster.  Foster is the Chair of the Governance Committee.

66.     The purpose of the Governance Committee is to identify qualified candidates to become Board members, select nominees for election as directors, select candidates to fill any vacancies on the Board, and develop and recommend corporate governance guidelines for the Company.

67.     The Charter of the Governance Committee contains specific areas of responsibility, including:

- "The Committee shall, at least annually, review the performance of each current director and shall consider the results of such evaluation when determining whether or not to recommend the nomination of such director for an additional term";
- "In appropriate circumstances, the Committee, in its discretion, shall consider and may recommend the removal of a director for cause, in accordance with the applicable provisions of the Company's Certificate of Incorporation, Bylaws and Corporate Governance Guidelines";
- "The Committee shall oversee the Board in the Board's annual review of its performance (including its composition and organization) and the performance of management, and will make appropriate recommendations to improve performance";

- "The Committee may make recommendations to the Board regarding governance matters, including, but not limited to, the Company's Certificate of Incorporation, Bylaws, this Charter and the charters of the Company's other committees"; and

- "The Committee shall develop and recommend to the Board the Corporate Governance Guidelines."

68.    The Governance Committee met four times during 2006 and five times during 2007.

## V.    THE INDIVIDUAL DEFENDANTS BREACHED THEIR DUTIES.

69.    The Individual Defendants breached their duties of loyalty and good faith by allowing or causing the Company to misrepresent its financial results and prospects, as detailed herein and by failing to prevent the Individual Defendants from taking illegal actions related to the misrepresentation. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of a several class action lawsuit that alleges violations of federal securities laws, SEC investigations, U.S. Attorney investigations, and FBI probes.

### A.    ArthroCare's Business.

70.    ArthroCare manufactures and markets surgical devices for soft-tissue surgery that use the Company's patented Coblation® technology. Coblation technology, as opposed to laser or other thermal technology, uses radiofrequency to affect soft-tissue at the molecular level without excessive heat. The Company manufactures its devices in the United States and Costa Rica, and has sales offices in the United States, Europe and Australia.

71.    ArthroCare's surgical devices are used in primarily three areas of treatment: (i) sports medicine; (ii) Ear, Nose & Throat ("ENT"); and (iii) spine.

### B.    The Individual Defendants Base the Company's Growth Upon a Singular and Suspect Increase in Sales of Spinal Surgery Devices.

72.    During the Relevant Period, ArthroCare's sports medicine and ENT sections saw modest growth that was commensurate with industry averages. However, during that same time,

ArthroCare's spinal section experienced explosive growth, *including a 95% increase in the Company's spinal devices from the third quarter of 2006 to the same period in 2007.*

73.    The phenomenal increase in the spinal section of ArthroCare was a substantial, if not the main, reason that ArthroCare stock remained above $40.00 (and peaked at approximately $65.00) from 2006 through the second quarter of 2008.

74.    However, approximately three-fourths of ArthroCare's spinal device sales during this growth period were through its sales agent DiscoCare. As noted previously, ArthroCare, until July 21, 2008, incorrectly characterized DiscoCare as a distributor.

75.    Subsequent investigatory reports on DiscoCare have also revealed that DiscoCare has the same ownership as one of the largest end-users of ArthroCare spinal surgery devices. Indeed, the same reports have indicated that the large end user who shares ownership with DiscoCare has engaged in "upcoding" medical records so that unnecessary or suspect spinal surgeries, primarily in the context of personal injury litigation, are paid for by third-party insurers.[3]

76.    In sum, the Individual Defendants allowed DiscoCare, an undisclosed sales agent of the Company, to provide surgical devices for spinal procedures to medical providers *without charging the medical providers for the devices*. Therefore, despite recognizing revenue at the time the device was delivered to the end-user medical providers, the Individual Defendants caused the Company, in order to receive payment for the devices it had "sold," rely upon either subsequent approval from third party insurance carriers (and such approval was unlikely if the spinal surgery was unnecessary or suspect), or improper "upcoding" by end users.

---

[3] *See* Andrew Left, "ArthroCare's Acquisition of DiscoCare: Trying to Put the Genie Back in the Bottle," *Citron Research*, January 8, 2008; Melissa Davis, "ArthroCare's Division Feeling Insurer's Heat," *The Street*, May 20, 2008.

77.     The Individual Defendants did not disclose this situation during the Relevant Period. The Individual Defendants only belatedly began to disclose this situation on July 21, 2008—after several investigative reports were published about the practice.

78.     Through their actions as described above, the Individual Defendants have harmed the good will of the Company by making it a target for these allegations. Moreover, they have implicated the Company in illegal and fraudulent practices, thereby causing permanent damage to the Company's future prospects.

### C.     The Individual Defendants Fail to Maintain Adequate Controls that Properly Recognize Revenue.

79.     Throughout the Relevant Period, there was an utter lack of internal controls at ArthroCare with regard to the Company's accounting practices and operations. These deficient controls included, among other things: (i) improper recognition of "sales" and "sales commissions"; (ii) poor documentation and support for intercompany transactions; and (iii) a lack of training in ethics and internal controls.

80.     A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. At ArthroCare, these internal controls were purported to include those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding

prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

81. The ultimate restatement of *eight years'* worth of Company's financial and operational results, however, is a tacit acknowledgement of an utter lack of financial controls and internal operational procedures at ArthroCare. These material weaknesses,[4] included, in part, the following:

(a) **Material weaknesses in entity-level controls.** Defendants caused ArthroCare not to maintain an effective control environment and entity-level controls included in the risk assessment, information and communications and monitoring components of internal control. These deficiencies resulted in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected and contributed to the development of other material weaknesses. The material weaknesses included:

(i) ArthroCare's finance and accounting employees were insufficiently trained, educated, and/or assessed for competency;

(ii) ArthroCare did not have sufficient controls in place to ensure the appropriate selection/use of and modifications to accounting policies; and

(iii) ArthroCare did not appropriately perform a comprehensive fraud risk assessment and design controls to address the risk of deliberate manipulation of the financial reporting process.

---

[4] A "material weakness" is a control deficiency, or combination of control deficiencies, that results in *more than a remote likelihood* that a material misstatement of the annual or interim financial statements will not be prevented or detected.

(b)     **Material weaknesses surrounding adequate financial statement preparation and review procedures.**  Defendants caused ArthroCare not to maintain adequate policies and procedures or employ personnel with sufficient knowledge and experience to ensure that timely, accurate and reliable consolidated financial statements were prepared and reviewed.   These deficiencies in internal controls resulted in material misstatements in revenue recognition.  The material weaknesses included:

(i)     inadequate review and/or controls over financial statement information, and related presentation and disclosure requirements;

(ii)     insufficient controls to ensure that key account reconciliations were prepared timely, appropriately reviewed and approved or properly reconciled to support detail; and

(iii)     inadequate review and authorization controls associated with product sales.

(c)     **Inadequate controls over the proper application of accounting principles.**  Defendants caused ArthroCare not to maintain adequate policies and procedures to account for various transactions and did not employ personnel with sufficient knowledge and experience to properly prepare, document and review the related accounting treatment to ensure that these transactions complied with GAAP.  These deficiencies in internal controls resulted in material misstatements in various account balances.  The material weaknesses included:

(i)     Sufficient review and approval controls were ***not*** designed to ensure that sales were accurately recorded and disclosed in accordance with proper accounting procedures; and

(ii)     Sufficient review and approval controls were *not* designed to ensure

that certain revenue transactions and related cost of these transactions were properly

accounted for.

**D.     The Individual Defendants Allow ArthroCare to Engage in Improper Financial Reporting and GAAP Violations During the Relevant Period.**

82.     Throughout the Relevant Period, the Individual Defendants caused or allowed

ArthroCare to file annual and quarterly reports with the SEC on Forms 10-Q and 10-K.  Those

forms, which included the Company's financial statements, were simultaneously distributed to

shareholders and the public. All such financial statements on those forms were improperly presented

in violation of GAAP, due to improper accounting.  Improper information was also disseminated to

shareholders and the public through press releases related to each annual and quarterly statement.

83.     Each of the improper Forms 10-K and 10-Q, and any amendments thereof, were

reviewed, prepared and/or endorsed by the Individual Defendants.  Since the passage of SOX, such

forms have also been signed and certified as accurate by the CEO and CFO serving in that fiscal

year.

84.     As a result of the Individual Defendants' improprieties, ArthroCare has now been

forced to admit that it was caused to inappropriately record transactions from 2000 through 2Q 2008,

and to restate financial results from that period to remove improperly reported income, because

financial statements for those periods were not a fair representation of ArthroCare's results, and were

presented in violation of GAAP and SEC rules. Those improper results were included in press

releases and periodic reports disseminated to the public and ArthroCare shareholders.

85.     GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practice at a particular

time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

86.    The fact that ArthroCare will restate the financial statements is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by ArthroCare was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶ 7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements, and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶ 14.    Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements.

87.    ArthroCare's announcement that it will restate results was not due to a change in reporting entity or a change in accounting principles, but rather due to deliberate manipulation and/or errors in previously issued financial statements.    Thus, the restatement is an admission by Defendants that ArthroCare's previously issued financial results and its public statements regarding those results were false.

88.    Due to these accounting improprieties, the Company was caused to present its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶ 10);

(b)    the principle that financial reporting should provide information that is useful to present and potential investors and creditors, and other users, in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

(c)    the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

(d)    the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to management was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(e)    the principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus,

although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

(f)     the principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

(h)     the principle that conservatism be used as a prudent reaction to uncertainty, to try to ensure that uncertainties and risks inherent in business situations are adequately considered, was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

89.     Further, the undisclosed adverse information concealed by Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

90.     Moreover, this was exactly the type of information that Defendants stated was true, accurate and reliable within the SOX certifications signed in conjunction with the filing of ArthroCare's Forms 10-K and 10-Q, and amendments thereof.

**E.    The   Individual   Defendants   Disseminate   Materially   False   and
Misleading Statements About the Company During the Relevant Period.**

91.    The Individual Defendants, because of their fiduciary duties of care, loyalty and good
faith, owed to ArthroCare a duty to ensure that the Company's financial reporting fairly presented, in
all material respects, the operations and financial condition of the Company.  In order to adequately
carry out these duties, it is and was necessary for the Individual Defendants to know and understand
the material, non-public information to be either disclosed or omitted from the Company's public
statements.  Here, however, this material, non-public information included : (i) the fact that the
Company lacked requisite internal controls and that, as a result, the Company's projections and
reported results were based upon defective assumptions and/or manipulated facts; and (ii) the fact
that the Company's financial statements were materially, which meant that the Company's revenue
and income were overstated from at least the beginning of 2000 until the end of the second quarter
2008.

92.    Furthermore, defendants Fitzgerald (2003-2009), Wilson (2001-at least 2007),
Lendau (2007-2009), Geremski (2006-2009), and Widman (2003-2007), as members of the Audit
Committee at various points during the Relevant Period, each had a special duty to know and
understand this material information as set out in the Audit Committee's charter, which provides that
the Audit Committee's primary responsibilities include: (i) overseeing evaluation of the Company's
internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards
and principles; and (iii) overseeing internal audits.  It was also the duty and responsibility of the
Audit Committee to communicate the results of its exercise of reasonable judgment to the full Board
of Directors, and for the full Board to ultimately monitor and oversee the Audit Committee, itself.

93.     Defendants Baker, Gluk, Gluk, Christensen, Giroux, Raffle, Sanchez, Denker, Applegate, and Moehring, as officers of ArthroCare, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants Baker, Fitzgerald, Foster, Wilson, Lendau, Boyan, Widman, Lewis, Campbell-White, Momsen, and Geremski, as directors of ArthroCare, had a duty to discuss this material information with management and fellow directors at any of the Board's meetings from 2000 through the first half of 2008, as well as during meetings of committees of the Board, including meetings of the Audit Committee during that time.

94.     Despite these duties, the Individual Defendants caused or allowed, by their actions or inactions the following improper statements to be disseminated by ArthroCare to the investing public and the Company's shareholders during the Relevant Period.

95.     On May 3, 2006, the Individual Defendants  caused or allowed ArthroCare to issue a press release that purported to report "*Record Revenues of $62.5 Million for the First Quarter; Net Income Increases 122 Percent.*"  In addition to the foregoing, this release stated, in relevant part, the following:

> ArthroCare Corp. (Nasdaq: ARTC), a multi-business medical device company that develops minimally invasive surgical products, announced today financial results for the first quarter ended March 31, 2006. First quarter product revenues were $60.3 million, a 26 percent increase over the $47.8 million recorded in the same quarter of the previous year. Total revenues, which include product revenues, license fees and royalties, for the first quarter were $62.5 million, a 26 percent increase over the $49.7 million reported in the first quarter of 2005.

> ArthroCare reported net income of $7.1 million, or $0.26 per diluted share, for the first quarter of 2006, compared to net income of $3.2 million, or $0.12 per diluted share, reported in the same quarter of 2005.

> *      *      *

> "Our strong performance in the first quarter provides us a solid foundation to build upon for the rest of the fiscal year," said Michael A. Baker, president and chief

executive officer for ArthroCare. "In the first quarter we generated record revenue and exceeded our objective for earnings growth. The momentum gained during the first quarter positions us well to meet the objectives we've set for 2006."

*   *   *

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2006 is as follows:

-- The company expects total revenues for fiscal 2006 to be the range of $255 million to $265 million.

-- For the second quarter of 2006, ArthroCare anticipates sequential revenue growth over the first quarter of 2006.

-- ArthroCare is revising its fiscal 2006 GAAP diluted EPS guidance, which includes the impact of FAS 123R, to $1.10 to $1.20 from the previous range of $1.05 to $1.20.

96.    On August 3, 2006, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that "*28% Revenue Growth Drives 60% Increase in Net Income for the Second Quarter.*" In addition to the foregoing, this release stated, in part, the following:

ArthroCare Corp. (Nasdaq:ARTC), a multi-business medical device company that develops minimally invasive surgical products, announced today financial results for the second quarter ended June 30, 2006. Second quarter product revenues were $63.8 million, a 28 percent increase over the $49.7 million recorded in the same quarter of the previous year. Total revenues, which include product revenues, license fees and royalties, were $66.0 million for the second quarter, a 28 percent increase over the $51.7 million reported in the second quarter of 2005.

ArthroCare reported net income of $7.7 million, or $0.28 per diluted share, for the second quarter of 2006, compared to net income of $4.8 million, or $0.19 per diluted share, reported in the same quarter of 2005.

*   *   *

REVENUE

In addition to second quarter product sales of $63.8 million, license fees, royalties and other revenue were $2.2 million in the second quarter of 2006, which represents 3 percent of total revenue, compared to $2.0 million, or 4 percent of total second quarter 2005 revenue. International product revenue for the second quarter of 2006 increased 19 percent compared to the same period last year, and represented 20 percent of product sales during the quarter.

40

* * *

"We are pleased to have generated a strong performance from both a revenue and earnings perspective in the second quarter," said Michael A. Baker, president and chief executive officer for ArthroCare. "We continued our recent trend of achieving record quarterly revenues and exceeded our earnings growth target. We look forward to further building upon the momentum we've produced during the first half of this year to accomplish our fiscal 2006 objectives."

* * *

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2006 is as follows:

--     The Company expects total revenues for fiscal 2006 to be in the range of $255 million to $265 million.

--     For the third quarter of 2006, ArthroCare anticipates sequential revenue growth over the second quarter of 2006.

--     ArthroCare expects fiscal 2006 GAAP diluted EPS, which includes the impact of FAS 123R, to be in the range of $1.10 to $1.20.

* * *

--     In fiscal 2007, ArthroCare expects revenue growth of at least 20 percent with earnings growing faster than revenues.

97.     On October 26, 2006, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that "*Third Quarter 2006 EPS Reaches $0.31 on Revenue Growth of 21%.*" In addition to the foregoing, this release stated, in part, the following:

ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the third quarter ended September 30, 2006 total revenues grew 21 percent to $64.7 million. Product revenue growth of 20 percent was led by a 21 percent increase in our Sports Medicine business unit and continued strong growth in ENT revenues. On an as-reported basis, ArthroCare's net income grew to $8.7 million, or $0.31 per diluted share, for the third quarter of 2006, reflecting growth in the Company's three major business units coupled with effective cost control.

41

"As reflected by the steady growth in our core Sports Medicine markets this quarter, we continue to set the standard among physicians and surgeons in arthroscopic surgery," noted Mike Baker, CEO of ArthroCare…

"Looking ahead to 2007, we are forecasting significant growth opportunities in all business units, with revenue growth of at least 20 percent, continued margin expansion and EPS growth continuing to exceed revenue growth."

* * *

REVENUE

In addition to third quarter product sales of $62.1 million, license fees, royalties and other revenue were $2.6 million in the third quarter of 2006, which represents 4 percent of total revenue, compared to $2.0 million, or four percent of total third quarter 2005 revenue….

* * *

[BUSINESS OUTLOOK]

ArthroCare's updated business outlook for fiscal 2006 is as follows:

- The Company expects total revenues for fiscal 2006 to be in the range of $260.0 million to $265.0 million, an increase of $5.0 million over previous guidance and includes the impact of discontinuing the distribution of a non-core product in Europe.

- ArthroCare expects fiscal 2006 GAAP diluted EPS, which        includes the impact of FAS 123R, to be in the range of $1.10 to $1.20.

- In fiscal 2007, ArthroCare expects total revenue growth of at        least 20 percent. The Company expects further improvement in both product and operating margins and for earnings to continue to grow faster than revenue. The Company plans to expand its 2007 guidance to provide revenue growth ranges by business unit and more specific earnings growth with the announcement of its fourth quarter results.

98.    On February 15, 2007, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that "*Fourth Quarter 2006 Revenues Reach $69.8 Million Revenues Reflect Growth in all Divisions.*" In addition to the foregoing, this release stated, in part, the following:

ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the fourth quarter ended December 31,

2006 total revenues grew 18 percent compared to the same period in the prior year to $69.8 million. Revenues grew in all divisions both on a year-over-year and sequential quarter basis. Product sales growth was led by a particularly strong 46 percent increase compared to the fourth quarter of 2005 in the Company's spine business due to improved penetration, acceptance by the surgical community and increased reimbursement.

On an as-reported basis, ArthroCare's net income grew to $8.2 million, or $0.29 per diluted share, for the fourth quarter of 2006....

"We are pleased to report a very successful 2006 with significant revenue and earnings growth across all business units and the accomplishment of numerous strategic milestones which position us well for 2007 and beyond," noted Mike Baker, CEO of ArthroCare.

FOURTH QUARTER FINANCIALS

Total revenues, which include product revenues, license fees and royalties, were $69.8 million for the fourth quarter of 2006, an 18 percent increase over the $59.3 million reported in the fourth quarter of 2005 and an eight percent increase over the $64.7 million reported in the third quarter of 2006.

\* \* \*

REVENUE

In addition to fourth quarter product sales of $67.2 million, license fees, royalties and other revenue were $2.6 million in the fourth quarter of 2006, which represents four percent of total revenue, compared to $1.9 million, or three percent of total fourth quarter 2005 revenue. International product sales represented 21 percent of product sales during the quarter.

\* \* \*

FISCAL YEAR-END 2006

For the fiscal year ended December 31, 2006, total revenues reached $263.0 million, a 23 percent increase compared with fiscal 2005 total revenues of $214.3 million. Net income for fiscal year 2006 was $31.7 million, or $1.14 per diluted share, compared to the fiscal year 2005 net income of $23.5 million, or $0.89 per diluted share. FAS 123R-related expenses in 2006 resulted in a non-cash charge to net income for stock-based compensation of approximately $5.4 million after taxes, or $0.19 per diluted share....

\* \* \*

[BUSINESS OUTLOOK]

43

ArthroCare's business outlook for fiscal 2007 is as follows:

--   The Company expects total revenue growth of 20 percent.

*   *   *

--   The Company anticipates sequential improvement in quarterly revenue growth rates beginning in the first quarter.

--   The Company expects earnings per share growth greater than revenue growth. GAAP diluted EPS is forecasted to be in the range of $1.40 to $1.50.

--   The Company expects further improvement in both product and operating margins and for earnings to continue to grow faster than revenue.

99.   On April 26, 2007, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that *"First Quarter 2007 Results Exceed Consensus Estimates."* In addition to the foregoing, this release stated, in relevant part, the following:

ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the first quarter ended March 31, 2007, total revenues grew 18 percent to $73.7 million, compared with $62.5 million in the prior year's quarter and consensus estimates for revenues of $73.1 million. Excluding sales of products discontinued in 2006, total revenues grew approximately 20 percent.

ArthroCare's net income of $7.1 million, or $0.25 per share, for the first quarter of 2007, was above consensus earnings estimates of $0.23 per share Quarterly performance highlights include significant revenue increases in the Company's three major business units, the launch of a key new product in the Company's Sports Medicine division, and continued investments in sales and marketing.

"This was a pivotal quarter for ArthroCare with important developments in each of our business units," noted Mike Baker, CEO of ArthroCare. "Our rapidly growing Spine business continued to demonstrate strong revenue growth based upon an expanding customer base and improvements in reimbursement. In our Sports Medicine business, we successfully launched a major new Opus non-metallic anchor and we believe we are on track to introduce several more key products in the second quarter. Our international revenue growth was driven by Sports Medicine Coblation products and a strong increase in United Kingdom tonsillectomy revenues."

*   *   *

REVENUE

In addition to first quarter product sales of $71.0 million, license fees, royalties and other revenue were $2.7 million in the first quarter of 2007, which represents four percent of total revenue, compared to $2.2 million, or four percent of total first quarter 2006 revenue….

\* \* \*

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2007 is as follows:

--     The Company expects total revenue growth of 20 percent.

\* \* \*

--     The Company anticipates sequential improvement in quarterly revenue growth rates.

--     The Company expects earnings per share growth greater than revenue growth. GAAP diluted EPS is forecasted to be in the range of $1.40 to $1.50.

--     The Company expects further improvement in both product and operating margins and for earnings to continue to grow faster than revenue.

100.     On July 26, 2007, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that "*Second Quarter 2007 Revenue of $80 Million, EPS of $0.37, Exceeding Consensus Estimates.*" In addition to the foregoing, this release stated, in part, the following:

AUSTIN, Texas AUSTIN, Texas, Jul 26, 2007 (BUSINESS WIRE) -- ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the second quarter ended June 30, 2007, total revenues grew 21 percent to $79.5 million, compared with $66.0 million in the prior year's second quarter. ArthroCare's second quarter net income of $10.4 million, or $0.37 per share, grew 35 percent, compared to net income of $7.7 million, or $0.28 per share a year ago…

"Through the first half of this year we have continued to aggressively pursue our core strategy of leveraging our platform technologies to develop breakthrough products and to put the infrastructure, clinical credibility, and reimbursement in place to drive the acceptance of those products in the marketplace," noted Mike Baker, CEO of ArthroCare.

\* \* \*

REVENUE

45

In addition to product sales of $76.6 million, royalties, fees and other revenue was $2.9 million in the second quarter of 2007, which represents four percent of total revenue, compared to $2.2 million, or three percent of total second quarter 2006 revenue. International product sales increased 27 percent over 2006, led by Sports Medicine products.

\*   \*   \*

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2007 is as follows:

--      The Company expects total revenue growth of at least 20 percent.

\*   \*   \*

--      The Company anticipates sequential improvement in quarterly revenue growth rates.

--      The Company expects earnings per share growth greater than revenue growth. GAAP diluted EPS is forecast to be in the range of $1.40 to $1.50.

--      The Company expects a 100 basis point improvement in both product and operating margins over the 2006 calendar year margins.

--      ArthroCare's preliminary guidance for 2008 is for revenue growth of at least 20 percent, for continued improvements in margin, and for earnings to grow faster than revenue.

101.    On October 22, 2007, the Individual Defendants caused or allowed ArthroCare to issue a release reporting *"Third Quarter 2007 Earnings Grow 28 Percent; Company Increases Fourth Quarter Guidance."* In addition to the foregoing, this release stated, in part, the following:

ArthroCare Corp. (Nasdaq:ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, announced that for the third quarter ended September 30, 2007, total revenues grew 21 percent to $78.5 million, compared with $64.7 million in the prior year's third quarter. ArthroCare's third quarter net income of $11.1 million, or $0.39 per share, grew 28 percent, compared to net income of $8.7 million, or $0.31 per share a year ago....

"Our strong performance in Q3 leaves us well positioned to accomplish our strategic and financial objectives for the full year," noted Mike Baker, CEO of ArthroCare.

\*   \*   \*

46

REVENUE

In addition to third quarter product sales of $75.5 million, royalties, fees and other revenue was $3.0 million in the third quarter of 2007 compared to $2.6 million in the third quarter of 2006, which represents four percent of total revenue in each of these periods. International product sales increased 35 percent in the third quarter over the third quarter 2006, led by Sports Medicine products in the Company's direct distribution markets.

\*   \*   \*

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2007 is as follows:

\*      The Company expects total revenue for the calendar year to be at least 20%.

\*      The Company expects GAAP diluted EPS for the fourth quarter to be $0.48 to $0.50 and GAAP diluted EPS for the full calendar year to be $1.48 to $1.50.

102.    On February 19, 2008, the Individual Defendants caused or allowed ArthroCare to issue a release announcing that *"Fourth Quarter 2007 Revenue Growth of 25 Percent Exceeds Consensus Estimates."* In addition to the foregoing, this release stated, in part, the following:

AUSTIN, Texas, Feb 19, 2008 (BUSINESS WIRE) -- ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, reported earnings results for the quarter and year ended December 31, 2007 as follows:

FOURTH QUARTER HIGHLIGHTS

--      Total revenue increased 25 percent to $87.5 million

--      Gross revenue margin increased four points to 76 percent

--      Operating profit increased five points to 20 percent

--      Net income increased 78 percent to $14.5 million, or $0.50 per diluted share

HIGHLIGHTS FOR THE YEAR ENDED DECEMBER 31, 2007

--      Total revenue increased 21 percent to $319.2 million

--      Gross revenue margin increased three points to 74 percent

--      Operating profit increased one point to 17 percent

--      Net income increased 36 percent to $43.2 million, or $1.50 per diluted share

--      Cash flow from operations increased 20 percent to $52.7 million

"We continue to systematically leverage our platform technologies in the market place, resulting in breakthrough products, growing clinical credibility within the surgical community and significant increases in product acceptance both in the U.S. and abroad," noted Mike Baker, CEO of ArthroCare.

REVENUE

Fourth quarter product sales of $84.5 million increased 26 percent from $67.2 million in the fourth quarter of 2006. Royalties, fees and other revenue was $3.0 million in the fourth quarter of 2007 compared to $2.6 million in the fourth quarter of 2006, which represents three percent of total revenue in the fourth quarter of 2007 and four percent of total revenue for the fourth quarter of 2006....

For the year ended December 31, 2007, product sales increased 21 percent to $307.6 million from $253.4 million in 2006. Royalties, fees and other revenue was $11.6 million for the year ended December 31, 2007 compared to $9.6 million in 2006, which represents four percent of total revenue in both years....

\*    \*    \*

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2008 and for the first quarter 2008 is as follows:

--      The Company expects total annual revenue growth of at least 20 percent.

\*    \*    \*

--      For 2008, the Company anticipates operating margin improvement of approximately 2 points.

--      The Company expects net income per share growth greater than revenue growth. GAAP diluted net income per share for 2008 is forecast to be in the range of $1.92 to $2.00.

--      For the first quarter, the Company expects revenue growth of at least 20 percent over the first quarter of 2007, with individual business unit revenues in line with calendar guidance.

-- Margins are expected to be lower in the first quarter than the Company's calendar year guidance due to acquisition integration expenses, annual holiday shutdown of the Company's Costa Rican facility and seasonal marketing expenses. The Company anticipates sequential improvement in quarterly margins during the remainder of the year.

-- Net income per share for the quarter is expected to be in the range of $0.30 to $0.32.

103.    On April 21, 2009, the Individual Defendants caused or allowed ArthroCare to issue a press release announcing that "*First Quarter Product Sales Increases 25 Percent, Net Income Increases 30 Percent.*"  In addition to the foregoing, this release stated, in part, the following:

ArthroCare's Revenue and Profit Exceed Consensus; Company Raises Guidance

AUSTIN, Texas, Apr 21, 2008 (BUSINESS WIRE) -- ArthroCare Corp. (Nasdaq: ARTC), a leader in developing state-of-the-art, minimally invasive surgical products, reported earnings results for the quarter ended March 31, 2008 with revenue increasing 23 percent, reaching $91.0 million compared with $73.7 million in the prior year quarter. Net income increased 30 percent to $9.3 million, or $0.34 per share, compared with $7.1 million, or $0.25 per share a year ago. Earnings per share exceeded the high end of the company's prior guidance by $0.02. Results were driven by better than anticipated results in the company's largest business, sports medicine, as well as increased market traction in the company's ENT business. The company's operating profit also showed significant increases.

"This quarter's results again demonstrate the potential of our core platform technology strategy to create value. The significant and sustained investment in R&D that we're making to execute this strategy is generating a stream of innovative new products. These new products allow us to drive rapid growth and because our approach is platform-driven, we are not overly dependent on any one product or market for our growth," noted Mike Baker, CEO of ArthroCare.

REVENUE

First quarter of 2008 product sales of $88.5 million increased 25 percent from $71.0 million in the first quarter of 2007. Royalties, fees, and other revenue was $2.5 million in the first quarter of 2008 compared with $2.7 million in the first quarter of 2007 and represented three percent of total revenue for the first quarter of 2008 and four percent of total revenue for the first quarter of 2007....

                           *   *   *

[BUSINESS OUTLOOK]

ArthroCare's business outlook for fiscal 2008 and for the second quarter of 2008 is as follows:

--   The Company reiterates that it expects total annual revenue growth of at least 20 percent.

--   For 2008, the Company anticipates operating margin improvement of at least 2.5 points.

--   The company expects the Corporate tax rate to be 24 percent for the year.

--   The Company expects net income per share growth greater than revenue growth. GAAP diluted net income per share for 2008 is forecast to be in the range of $1.95 to $2.00.

--   For the second quarter, the Company expects revenues and earnings in line with the current analyst consensus.

ArthroCare's preliminary business outlook for fiscal 2009 is as follows:

--   The company expects total revenue growth of at least 20 percent.

--   The company expects earnings per share growth in excess of 35 percent.

104.   Each of the above statements were materially false and misleading, or omitted information necessary to make the statements that were made not materially false and misleading, in that, among other things: (a) the Company's revenues, earnings, and accounts were materially overstated due to the Individual Defendants' improper revenue recognition procedures; (b) the Company's revenues, earnings, and accounts were based in material part on Defendants' improper sales efforts through the DiscoCare model; (c) DiscoCare was a sales agent and not a distributor of ArthroCare's product for accounting purposes; (d) the Company's revenues and results were dependent on sales for procedures that were not medically necessary; (e) the Company's revenues and results were based in material part on the Individual Defendants' efforts to circumvent legal and legitimate health insurance billing procedures, including improper "upcoding" of medical procedures; (f) the Company's financial condition was not "fairly presented" in accordance with

GAAP; (g) the Company's Forms 10-Q and 10-K failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material effect on the Company's financial results, as required by Regulation S-K, Item 303; (h) the Company's accounting controls and procedures were not as described in the statements; (i) the Company's revenue and other financial projections, being based on illegal and illegitimate sales and accounting practices, had no reasonable basis when made and were therefore false and misleading within the standards of the federal securities laws; and (j) the Company was not experiencing "growing clinical credibility within the surgical community and significant increases in product acceptance" but rather decreasing measures of both.

105. In addition to the press releases that these Defendants caused or allowed to be published by the Company consistently announcing results that were artificially inflated by defendants' improper accounting, also during the Relevant Period these defendants prepared or aided in the preparation and filing of quarterly and annual reports with the SEC that also contained false and misleading statements about the Company. Again, as a result of these defendants' actions or inactions the following improper statements were caused to be disseminated by ArthroCare to the investing public and the Company's shareholders during the Relevant Period, and were signed by the Individual Defendants, as follows:

| Filing | Date | Signatories | Certified By |
|--------|------|-------------|--------------|
| 1Q:06 Form 10-Q | 05/05/06 | Michael Baker (CEO)<br>Fernando Sanchez (CFO) | Michael Baker (CEO)<br>Fernando Sanchez (CFO) |
| 2Q:06 Form 10-Q | 08/04/06 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 3Q:06 Form 10-Q | 10/31/06 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 2006 Form 10-K | 02/27/07 | Michael Baker (CEO);<br>Michael Gluk (CFO);<br>Directors:<br>David F. Fitzgerald;<br>James Foster;<br>Peter L. Wilson;<br>Jerry P Widman;<br>Tord B. Lendau;<br>Barbara D. Boyan and<br>Terrence E. Geremski | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 1Q:07 Form 10-Q | 05/01/07 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 2Q:07 Form 10-Q | 08/01/07 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 3Q:07 Form 10-Q | 10/29/07 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 2007 Form 10-K | 02/29/08 | Michael Baker (CEO);<br>Michael Gluk (CFO);<br>Directors:<br>David F. Fitzgerald;<br>James Foster;<br>Peter L. Wilson;<br>Tord B. Lendau;<br>Barbara D. Boyan and<br>Terrence E. Geremski | Michael Baker (CEO)<br>Michael Gluk (CFO) |
| 1Q:08 Form 10-Q | 05/12/08 | Michael Baker (CEO)<br>Michael Gluk (CFO) | Michael Baker (CEO)<br>Michael Gluk (CFO) |

106.    Each of the Form(s) 10-Q prepared and filed by the Individual Defendants set forth above was caused to contain materially false and misleading statements about the Company, and included financial statements that were not prepared in conformity with Generally Accepted Accounting Principles.  An example of such false representations that were caused to be included in the Company's 1Q:06 Form 10-Q, and which was reproduced in substantially similar form in the other Form(s) 10-Q prepared and filed by the Individual Defendants set forth above, included the following:

Basis of Presentation

The unaudited interim condensed consolidated financial statements include the accounts of ArthroCare Corporation and its wholly-owned subsidiaries (collectively, the "Company" or "ArthroCare").  All intercompany accounts and transactions have been eliminated in consolidation.

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States for complete financial statements.   In the opinion of management, the unaudited interim condensed consolidated financial statements reflect all adjustments (consisting of only normal recurring adjustments) necessary for a fair statement of the Company's financial position, results of operations and cash flows for the periods presented.   These financial statements should be read in conjunction with the Company's consolidated financial statements and notes thereto filed with the United States Securities and Exchange Commission ("SEC") in the Company's annual report on Form 10-K for the year ended December 31, 2005....

\*    \*    \*

Use of Estimates

The condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, using management's best estimates and judgments where appropriate. These estimates and judgments affect the reported amounts of assets and liabilities and disclosure of the contingent assets and liabilities at the date of the financial statements....

107.    The statements regarding these defendants' compliance with GAAP was further reinforced in the Company's annual report, filed with the SEC pursuant to Form 10-K following year end 2006 and 2007.  For example, the Company's 2006 Form 10-K was caused and allowed to state, in part, the following:

Critical Accounting Policies and Estimates

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make judgments, assumptions and estimates that affect the amounts reported in the Consolidated Financial Statements and accompanying notes. Note 2 to the Consolidated Financial Statements describes the significant accounting policies and methods used in the preparation of the Consolidated Financial Statements. The most significant areas involving management judgments and estimates are described below and are impacted significantly by judgments, assumptions, and estimates used in the preparation of the Consolidated Financial Statements. Actual results could differ materially from these estimates.

Revenue Recognition

We recognize product revenue after shipment of our products to customers has occurred, any acceptance terms have been fulfilled, no significant contractual obligations remain and collection of the related receivable is reasonably assured. Revenue is reported net of a provision for estimated product returns.

We recognize license fee and other revenue over the term of the associated agreement unless the fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process. Royalties are recognized as earned, generally based on the licensees' product shipments. These items are classified as royalties, fees and other revenues in the accompanying statements of operations. Amounts billed to customers relating to shipping and handling costs have also been classified as royalties, fees and other revenues and related costs are classified as cost of product sales in the accompanying statements of operations. Additionally, we assess risks of loss on accounts receivable and make adjustments to our allowance for doubtful accounts based on our assessment. In estimating this allowance, we consider factors such as historical collection experience, a customer's current credit-worthiness, customer concentrations, the age of the receivable balance, both individually and in the aggregate, and general economic conditions that may affect a customer's ability to pay. Actual customer collections could differ from our estimates. We believe that the allowance for doubtful accounts of $2.7 million at December 31, 2006 is adequate to provide for probable losses associated with accounts receivable.

108.    Each of the Company's Form(s) 10-Q and Form(s) 10-K also contained statements

that purported to attest to the sufficiency of the Controls and Procedures that were purported to be in

place at the Company throughout the Relevant Period. An example of such statements concerning

the Controls and Procedures that the Individual Defendants purported to have in place at the

Company was reported in the 2006 Form 10-K, and repeated elsewhere, in part, as follows

ITEM 9A.      CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and
15d-15(e) adopted by the SEC under the Securities Exchange Act of 1934, as
amended (the "Exchange Act")) that are designed to ensure that information required
to be disclosed in our filings under the Exchange Act is recorded, processed,
summarized and reported within the time periods specified in the SEC's rules and
forms, and that such information is accumulated and communicated to management,
including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as
appropriate, to allow timely decisions regarding required disclosure.

We carried out an evaluation under the supervision and with the participation of our
management, including our CEO and CFO, of the effectiveness of the design and
operation of our disclosure controls and procedures as of December 31, 2006. Based
upon this evaluation, our CEO and CFO have concluded that the design and
operation of our disclosure controls and procedures were effective as of December
31, 2006. Accordingly, management believes that the financial statements included
in this report fairly present in all material respects our financial condition, results of
operations and cash flows for the periods presented.

Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal
control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the
Exchange Act and for our assessment of the effectiveness of internal control over
financial reporting. Our internal control over financial reporting is a process designed
to provide reasonable assurance regarding the reliability of financial reporting and
the preparation of financial statements for external purposes in accordance with
accounting principles generally accepted in the United States of America.

*   *   *

Management, including our CEO and CFO, has assessed the effectiveness of our internal control over financial reporting as of December 31, 2006. In making its assessment of internal control over financial reporting, management used the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). This assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls. Based on the results of this assessment, management has concluded that our internal control over financial reporting was effective as of December 31, 2006.

*   *   *

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

109.    In addition to the foregoing, each of the Form(s) 10-Q and Form(s) 10-K the Individual Defendants caused to be filed with the SEC set forth above also contained Certifications that purported to attest to the accuracy and completeness of these statements.  As evidence of this, attached to each of the quarterly and annual reports to the SEC was a Certification signed by defendants Gluk and Baker that was substantially similar to the foregoing Certification contained in the Company's 2Q:06 Form 10-Q, as follows:

**CERTIFICATION**
**PURSUANT TO RULE 13a-14(a)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

1.  I have reviewed this quarterly report on Form 10-Q of ArthroCare Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

56

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the registrant's audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect ArthroCare Corporation's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 4, 2006

/s/ Michael A. Baker
Michael A. Baker
President and Chief Executive Officer

\*    \*    \*

Date: August 4, 2006            /s/ Michael Gluk

                                      Michael Gluk

                                      Chief Financial Officer

\*    \*    \*

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of ArthroCare Corporation (the "Company") hereby certifies, to such officer's knowledge, that:

     (i)     The accompanying Quarterly Report on Form 10-Q of the Company for the three and six months ended June 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

     (ii)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 4, 2006           /s/ Michael A. Baker

                                      Michael A. Baker

                                      President and Chief Executive Officer

\*    \*    \*

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of ArthroCare Corporation (the "Company") hereby certifies, to such officer's knowledge, that:

     (i)     The accompanying Quarterly Report on Form 10-Q of the Company for the three and six months ended June 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

     (ii)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 4, 2006          /s/ Michael Gluk

                                        Michael Gluk

                                        Chief Financial Officer

## VI.    CONSPIRACY, AIDNG AND ABETTING AND CONCERTED ACTION.

110.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

111.    During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at ArthroCare and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of ArthroCare, regarding the Individual Defendants' management of ArthroCare's operations, the Company's financial health and stability, future business prospects, and accounting that were misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

112.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least late 2000 and continuing thereafter regarding the improper accounting and financial statements discussed herein.  During this time, the Individual

Defendants caused the Company to conceal the true fact that ArthroCare was misrepresenting its financial results. In addition, the defendants also made other specific, improper statements about ArthroCare's financial performance and future business prospects, as alleged herein. Those improper statements included failure to disclose information about accounting irregularities, and internal control problems, as well as overstatement of revenue, material overstatement of prepaid royalties, and material understatement of deferred income and accrued royalty accounts.

113.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of ArthroCare common stock so they could: (i) dispose of over $30 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

114.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly and grossly negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, and with the support of management, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

115.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.   THE TRUTH EMERGES CONCERNING ARTHROCARE'S ACTUAL FINANCIAL AND OPERATIONAL CONDITION.

116.    On July 21, 2008, the Individual Defendants shocked the market after they caused ArthroCare to issue a release announcing that the Company would be forced to restate its financial results for the complete two years of 2006 and 2007, as well as the first reported quarter of 2008, as a result of faulty sales calculations and misreporting of revenue, net income, earnings and profits per share  At that time, the Individual Defendants cause the Company state that it expected to lower revenue by up to $37 million.

117.    The release caused to be published by the Individual Defendants at that time, stated in part, the following:

### ArthroCare to Restate Financial Statements

### Audit Committee Overseeing Review of Internal Controls

ArthroCare Corp. (NASDAQ:ARTC - News) announced today that it will restate its financial statements for the years ended December 31, 2006 and 2007, the quarters ended September 30, 2006, December 31, 2006, each of the quarters of 2007 and the quarter ended March 31, 2008, as a result of the determination by the Audit Committee of the Board of Directors on July 20, 2008, that the financial statements for such periods can no longer be relied upon. The restatement follows a recommendation by management that revenue in these previously issued financial statements should be adjusted because: the relationship between the Company and DiscoCare, Inc. during the periods being restated was a sales agent relationship, rather than that of a traditional distributor; and that the sales price of products sold to State of the Art Medical Products, Inc.("SOTA"), Boracchia & Associates and Clinical Technology, Inc. cannot be considered fixed or determinable upon shipment by ArthroCare during the periods being restated. The Company will therefore account for sales by ArthroCare of products to each of these entities from the third quarter of 2006 to March 31, 2008, under a sell-through revenue recognition method that is appropriate for both of these situations, as opposed to a sell-in method. Under the sell-through method, revenue is not recognized until after the surgery is performed or a subsequent sale to another customer occurs. Sales to these companies for periods prior to the third quarter of 2006 will continue to be accounted for under

the previous method of revenue recognition, either sell-in or sell-through depending on the terms of the previous contract with each company.

On July 20, 2008, the Audit Committee discussed the matters disclosed in this press release with management and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"). The restatement primarily involves the timing of revenue recognition from one period to another and is expected to result in a non-cash reduction in revenue for the periods being restated. The restatement is not expected to affect future cash flows. In addition to the changes from the sell-in method to the sell-through revenue recognition method for the four entities discussed above, the restatement will correct errors identified by management regarding: the classification to record as an offset to revenue for commissions paid by ArthroCare to SOTA, Clinical Technology and Arthroscopy & Medical Equipment International, Inc. on products purchased directly by the distributor as principal and subsequently resold to third parties previously recorded as sales and marketing expense; the classification to record as an offset to revenue of distribution and marketing fees paid to SOTA, Boracchia, Frontier Medical, Inc. and Clinical Technology previously recorded as sales and marketing expense that did not meet the criteria of EITF 01-9 "Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vender's Products);" the allocation of the purchase price for the DiscoCare acquisition on December 31, 2007, under FAS 141, "Business Combinations" as a result of the conclusion that DiscoCare was an agent prior to the acquisition, not a distributor; and a foreign currency translation error in the fourth quarter of 2006 which was identified during management's conversion to the SAP enterprise financial reporting system.

The sales prices to SOTA, Boracchia, and Clinical Technology were not fixed or determinable under Staff Accounting Bulletin 104, "Revenue Recognition," which sets forth four criteria which are necessary before revenue can be recognized, including that sales prices are required to be fixed or determinable, due to rebates to the distributors if the distributors sold the products at prices below their purchase price from ArthroCare. Not meeting the criteria can result in a deferral of revenue recognition which is what management expects to occur in the restatement.

While the restatement is being completed, the Audit Committee will oversee a review of the scope and nature of the Company's internal controls. That review will be conducted by Latham & Watkins LLP with the assistance of FTI Consulting, Inc. Depending on the results of this review, it may be expanded beyond internal controls. This review is being conducted separately from management's reassessment of the effectiveness of internal control over financial reporting. No conclusions on the effectiveness of internal control over financial reporting or disclosure controls and procedures are expected prior to the conclusion of the restatement and the filing of amended filings with the Securities and Exchange Commission (the "SEC").

Management estimates that the effect of the restatement will be a non-cash reduction in revenue in 2006 of $4 million to $7 million and in 2007 of $20 million to $25

million. The estimated effect of the restatement on revenue in the first quarter of 2008 will be a reduction of $2 million to $5 million. Management estimates that the restatement will result in material reductions in operating income and net income for the annual and quarterly periods being restated. All estimates contained in this release are subject to change as management completes the restatement of the financial statements. The Company's independent registered public accounting firm has not audited or reviewed these estimates or ranges. An audit of annual financial statements and/or a Statement of Accounting Standards 100 ("SAS 100") review of quarterly financial statements could also result in material changes to these ranges and estimates.

Management's reassessment of its prior accounting for sales to distributors resulted from discussions initiated by PwC.

118.     Following this belated, partial disclosure by the Individual Defendants regarding the true operational and financial condition of the Company, and once they revealed that they had caused ArthroCare to overstate its financial results since the beginning of 2006, shares of the Company plummeted—falling from a close of $40.03 per share the prior trading day, to a close of $23.21 per share on July 21, 2008—*a 42 percent decline in a single day*.  The following day, as investors continued to understand the impact of this restatement on the Company and its future growth prospects, shares continued to trade lower—falling below $20.00 per share   On July 21, 2008, over 14.63 million shares traded, over 15 times the average daily trading volume for ArthroCare shares.

119.     On December 19, 2008, Defendants caused the Company to announce that the period for which it would restate financial results had expanded to *over eight years*, that the accounting improprieties had involved not just the Spine Unit but also Sports Medicine and ENT, and that certain of the Defendants had resigned for their roles in the improprieties.

120.     The Company's press release that day stated:

**ArthroCare Announces Expansion of Periods Covered by Restatement of Financial Statements and Withdrawal of Previously Disclosed Anticipated Adjustments; Management Changes; Subpoenas for Production of Documents**

AUSTIN, Texas, Dec 19, 2008 (BUSINESS WIRE)—ArthroCare Corp. (NASDAQ: ARTC) announced today that it will expand the periods covered by the previously announced restatement of its financial statements, and that it has withdrawn its estimates of the ranges of the effects of the restatement, which were previously announced on July 21, 2008. The Company also announced certain facts identified in the review of the Company's internal controls being conducted under the supervision of the Audit Committee of the Board of Directors (the "Review") as well as matters identified by management as part of the restatement process. In addition, the Company announced the resignation of three officers of the Company, including two executive officers, as well as other management changes. Finally, the Company announced the receipt of two subpoenas for the production of documents relating to DiscoCare, Inc. ("DiscoCare").

While the Review is not complete, the Audit Committee has identified facts indicating that there were accounting errors and possible irregularities, which are now being considered as part of the restatement. Substantially all of these facts relate to the manner in which the Company recognized revenue on (a) sales to certain of the Company's distributors, sales agents and customers and (b) other sales programs, during the period from fiscal 2005 through fiscal 2008. These transactions involved distributors, customers or programs in the Company's Spine, Sports Medicine, and Ear, Nose, and Throat ("ENT") business units. *The transactions that were improperly accounted for were primarily quarter-end transactions and were frequently structured in an effort to meet revenue forecasts.*

Facts identified in the Review indicate that actions employed by senior sales management, including the Senior Vice President of the Strategic Business Units (John Raffle) and the former Senior Vice President and General Manager of the Spine Unit (David Applegate), primarily led to the accounting errors and possible irregularities now being considered as part of the Company's financial restatement. Those actions included *failing to communicate and/or withholding key information and practices bearing on revenue recognition and other accounting issues to the Company's accounting staff or the Company's independent registered public accounting firm.*

As a result of the facts identified in the Review to date, three officers, including two executive officers, have resigned. Michael Gluk, Senior Vice President and Chief Financial Officer; John Raffle, Senior Vice President, Strategic Business Units; and David Applegate, former Senior Vice President and General Manager, Spine, have resigned effective immediately. The Company is currently negotiating separation agreements with these individuals that may include separation payments and limited benefits in exchange for their entry into release of claims agreements. It is anticipated that Mr. Raffle will be offered a consulting agreement with respect to an

64

ongoing intellectual property litigation matter.

The Review also identified facts that suggest that *the Company had deficiencies, some of which constituted material weaknesses in internal control over financial reporting, that, in part, likely led to the improper accounting for these transactions, including, but not limited to an inadequate control environment in that the Company environment appears to be overly driven by sales generation, and certain senior executives appeared to lack a significant appreciation for internal control over financial reporting and accounting principles relating to revenue recognition.* Other deficiencies in internal control over financial reporting include: inadequate or *lack of revenue recognition training for sales and sales support personnel*; insufficient technical expertise in Generally Accepted Accounting Principles prior to February 2007; *inadequate controls or processes for contract and purchase order review*, for the checking of exceptions to the revenue recognition policies and procedures on an ongoing basis, for communication of key information bearing on revenue recognition and other accounting issues, and for the assessment of customers' credit or appropriate credit levels; and *an inadequate reporting structure, particularly with respect to the customer service and order entry functions.* While management is in the process of remediating some of these deficiencies, some of the material weaknesses may not be remediated before the restatement is completed.

In addition to the Review, management is conducting its own analysis as part of the restatement process. This analysis has identified additional items that will require adjustments to the Company's historical financial statements such that the restatement will now include the years ended December 31, 2000 through 2005, in addition to the previously announced years ended December 31, 2006 and 2007, and will now include all quarters in those years and the quarter ended March 31, 2008. Management has determined that *the errors identified to date by the Review and by management in its separate analysis can collectively be categorized into four areas: revenue recognition, expense reclassification, purchase price allocation and/or intangible asset impairments in connection with the Company's acquisition of DiscoCare and foreign exchange translation.*

To date the errors and/or irregularities identified involve primarily the timing of revenue recognition, including reductions in revenue due to customer return rights that previously should have prevented revenue from being recognized upon shipment, inability to demonstrate collectibility of customers' orders upon shipment and product shipments in advance of requested delivery dates. In addition, the sales price of products sold to certain customers cannot be considered fixed or determinable upon shipment by ArthroCare and therefore will be accounted for as sales by ArthroCare under a sell-through revenue recognition method, as opposed to a sell-in method. Under the sell-through method, revenue is not recognized until after the surgery is performed or a subsequent sale to another customer occurs. The restatement will also correct errors relating to the classification as an offset to revenue for commissions paid by ArthroCare to certain distributors on products purchased directly by the distributor as principal and subsequently resold to third parties which were previously recorded as sales and marketing expense; the

classification as an offset to revenue of distribution and marketing fees paid to certain customers previously recorded as sales and marketing expense that did not meet the criteria of Emerging Issues Task Force Issue No. 01-09: Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products). In addition, management is assessing the purchase price allocation of the consideration paid to DiscoCare's principal in connection with the Company's acquisition of DiscoCare on December 31, 2007, and whether goodwill recorded in conjunction with the acquisition is impaired pursuant to Statement of Financial Accounting Standard No. 142, Goodwill and Other Intangible Assets, and Statement of Financial Accounting Standard No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets, and/or should have been recorded in whole or in part as a loss on termination of the preexisting relationship on the date of the acquisition pursuant to Emerging Issues Task Force Issue No. 04-01: Accounting for Preexisting Relationships between the Parties to a Business Combination. Finally, management has identified a foreign currency translation error in the fourth quarter of 2006 which was identified during management's conversion to the SAP enterprise financial reporting system as well as other potential foreign exchange translation errors.

As a result of the items identified to date by the Review and management's own analysis of the accounting matters referenced above, upon management's recommendation, the Audit Committee determined on December 18, 2008 that *the financial statements for the fiscal years ended December 31, 2000 through 2005, for each of the quarters of the fiscal years ended December 31, 2000 through 2005 and for the two quarters ended June 30, 2006 can no longer be relied upon*.

On December 18, 2008, management, in consultation with Latham & Watkins, LLP, the Company's outside counsel, and FTI Consulting, Inc., the Company's forensic and technical accounting advisors, discussed the matters disclosed in this press release with the Audit Committee, and the Audit Committee and management discussed these matters with Company's independent registered public accounting firm, PricewaterhouseCoopers LLP. The Company will file its restated financial statements as soon as practicable following the completion of the Review.

Management is assessing the effect of the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures. This assessment includes the deficiencies in internal control over financial reporting discussed above. Management will not reach a final conclusion on the restatement's effect on internal control over financial reporting or disclosure controls and procedures until completion of the restatement.

The Audit Committee, upon a recommendation from management, has determined that the ranges previously provided for the anticipated impact of the restatement for the two quarters ended December 31, 2006, for the year ended December 31, 2007 and for the quarter ended March 31, 2008 no longer represent management's best estimates. *In view of the ongoing restatement process and the scope and nature of the items being restated over a multi-year period, management is not providing ranges for the anticipated impact of the restatement for any of the periods that are*

*being restated.* Management also believes the estimate previously provided in the Company's filing on Form 12b-25, dated August 12, 2008, for revenue for the second quarter of 2008 no longer represents management's best estimate.

Other Changes in Management

The Company announced the promotions of James Pacek to the position of Senior Vice President, Strategic Business Units; Sten Dahlborg to the position of Senior Vice President and President, International; Richard Rew to the position of Senior Vice President and General Counsel; Michael Moehring to the position of Vice President and General Manager, Spine; and Brian Simmons to the position of Vice President, Finance and Chief Accounting Officer. In connection with their promotions, Messrs. Rew and Pacek will each enter into a Senior Vice President continuity agreement with the Company. The Company is conducting a search for an interim Chief Financial Officer.

Changes in Operations

In addition, management has made operational changes, including changes related to the Company's DiscoCare subsidiary. Among these changes, management has: (1) discontinued the practice of providing devices at no charge in exchange for a letter of protection in personal injury cases; (2) is eliminating the DiscoCare business development group, which primarily focused on the letter of protection aspect of the business; and (3) begun the process of closing DiscoCare's facility in Florida.

Subpoenas for Production of Documents

The Company and its DiscoCare subsidiary have each received grand jury subpoenas issued by the United States Attorney for the Southern District of Florida requesting documents largely related to DiscoCare's operations before and after the Company's acquisition of DiscoCare. The Company intends to cooperate with the investigation. [Emphases added.]

121.    In response to this news, ArthroCare's publicly-traded share price dropped from $16.23 to $5.92 on December 19, 2008—*a 64 percent drop in a single day*. Volume of 11 million shares was approximately 30 times higher than the previous day.

122.    Finally, on February 18, 2009, the other shoe dropped. On that day, ArthroCare's Audit Committee announced that it had found evidence of widespread abuses at ArthroCare related to Spine Unit billing practices—so much so that the committee determined to take action even before the review was complete, calling upon defendants Baker (ArthroCare's CEO), Moehring, and Denker to resign immediately. At the same time, the Company announced that the SEC announced

that its then-informal investigation of ArthroCare had been converted into a formal proceeding—

giving the SEC power to subpoena witnesses and documents.

123.   The Company issued the following press release on February 18, 2009:

**ArthroCare Announces Review of Insurance Billing Practices;
CEO Departure and Management Changes; Investigations by
SEC and US Attorney Offices in Florida and North Carolina**

AUSTIN, Texas—(BUSINESS WIRE)—ArthroCare Corp. (PINK SHEETS: ARTC)
announced today that a review being conducted by the Audit Committee has
*identified certain improper practices in the insurance billing and healthcare
compliance practices associated with the Company's Spine Business Unit.*

While the review, which is being conducted with the assistance of outside counsel
Latham & Watkins LLP, is not yet complete (as described below), the Audit
Committee has reviewed *evidence that indicates that the Company's Spine
Business Unit engaged in and may have caused others to engage in improper
practices in certain instances by: (1) seeking separate reimbursement from
insurers for Company products in connection with procedures which were
contractually reimbursed on a global basis; (2) making inaccurate statements in
claims submitted to insurers regarding the place where particular procedures were
performed; (3) providing physicians and insurers with descriptions of Company
technologies which had the effect of circumventing payor policies that did not
cover such technologies; and (4) recommending and advocating to physicians the
use of a Current Procedural Terminology code to identify its coblation
nucleoplasty technology that was not approved by the American Medical
Association and may have not properly described the procedure that was
performed.*   The improper practices identified to date by the review may have
occurred since at least 2006.

The Audit Committee was informed that certain sales and marketing personnel
within the Spine Business Unit provided physicians and their billing staff with
merchandise and administrative services at no charge potentially in exchange for
their utilization of the Company's products. The Audit Committee has determined
that *Company personnel at all levels lacked adequate healthcare compliance
training and that Company billing personnel lacked adequate training and
supervision in insurance reimbursement requirements.*  In addition to considering
and implementing remediation efforts, the Audit Committee is undertaking a review
of such practices in other business units.

The Company is unable to estimate the possible effect of the review on the ongoing
restatement of its financial statements for the years 2000 through 2007 and the
quarter ended March 31, 2008.

In connection with the review, the Company announced the departure, effective
immediately, of Michael A. Baker from his position as the Company's President and
Chief Executive Officer. Mr. Baker currently remains a member of the Company's

68

Board of Directors. The Company also announced the resignations, effective immediately, of Michael Moehring, former Vice President and General Manager of the Spine Business Unit, and Michael Denker, former Director of Sales Development and Training.

The Board of Directors has named David Fitzgerald as Acting President and Chief Executive Officer. Mr. Fitzgerald, age 75, has been a member of the Company's Board of Directors since 2003. Mr. Fitzgerald, who has stepped down as a member of the Compensation and Audit Committees of the Board of Directors, will remain as a member of the Board of Directors. Prior to becoming a member of the Company's Board of Directors, he spent twenty-five years in management positions at Pfizer, Inc., serving as President and Chief Executive Officer of its Howmedica division during his last fifteen years with the company, prior to retiring in 1996. Mr. Fitzgerald is principally employed as a consultant in the medical device industry. He also serves on the Board of Directors of Orthovita, Inc. and on the Board of Advisors of Sandvik MedTech, a contract manufacturer in the medical devices area. He served on the Board of Directors of LifeCell Corporation from 2001 until the company was acquired by Kinetic Concepts, Inc. in 2008. He holds a B.S. from American International College and a M.B.A. from New York University. Compensation arrangements with Mr. Fitzgerald are pending.

The Company also announced that *the Securities and Exchange Commission has issued a formal order of investigation in the previously-disclosed investigation by the SEC's Division of Enforcement into the Company's restatement of financial results. As a result, the SEC staff now has the authority to subpoena witnesses and documents.* The Company has also been informed by the United States Attorney's office in the Southern District of Florida that the Company and its DiscoCare subsidiary are targets of an investigation being conducted by that United States Attorney's office and have also been informed that the United States Attorney's office in North Carolina is conducting a separate investigation of the Company, which is related to that being conducted in the Southern District of Florida. The Company is cooperating with the investigations being conducted by the SEC and the United States Attorneys' offices.

The Company has sent a notice of claim pursuant to the Escrow Agreement established in connection with the Company's acquisition of DiscoCare to the sole selling stockholder of DiscoCare alleging breaches of certain representations and warranties in the stock purchase agreement. The notice of claim is intended to have the effect of preventing the release of $1.5 million in escrow and can lead to further proceedings against the sole selling stockholder. The Company expects the notice of claim to be disputed in arbitration proceedings.

The Company has implemented and is in the process of implementing remediation measures, including recent cessation of direct billing to insurers by the Company's Sports Medicine and Spine Business Units. [Emphases added.]

124.     After the above revelations seeped into the market, the Company's value was

diminished as its market capitalization fell about 65 percent from the Relevant Period high of $65

per share when the Defendants were finally forced to reveal the truth on July 20, 2008. As of today's date, ArthroCare's market capitalization has fallen by $1.61 billion—or 93 percent. The stock closed at approximately $4.50 per share on February 18, 2009.

## VIII.  THE INDEPENDENT AUDITOR'S REPORTS WERE MATERIALLY FALSE AND MISLEADING.

125.    At all times during the Relevant Period, PwC served as the Company's Independent Certified Public Accountants and Auditors. In this capacity, defendant PwC audited the Company's financial statements, results of operations and the balance sheet, and provided a yearly report that certified that the financial results were true, accurate and reliable and prepared in conformity with GAAP. In fact, contained in each of the Company's annual reports filed with the SEC during the Relevant Period, the auditors stated, "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ArthroCare Company and subsidiaries," or a statement of similar effect.

126.    In addition to the foregoing, shareholders were willing to, and did, pay millions of dollars in audit and non-audit fees to PwC to compensate the Auditor Defendant for conducting a purported significant "due diligence" investigation into the Company in connection with the these Annual Reports. The Auditor Defendant's due diligence investigation was a critical component of the Company's Annual Report, and this was supposed to provide investors with important safeguards and protections.

127.    The due diligence investigation that was required by the Auditor Defendant included a detailed investigation into ArthroCare's sales, accounting, controls, procedures and it also required the Auditor Defendant to test the assumptions and verify the projections adopted or ratified by the Individual Defendants, the Audit Committee or the Board, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation

70

would have extended well beyond a mere casual view of ArthroCare's books and records, and its accounting, financial report and operational and financial controls.  The failure of the Auditor Defendant to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

128.    In fact, rather than conduct an adequate due diligence investigation during the Relevant Period that would have uncovered the rudimentary accounting fraud scheme that was occurring at ArthroCare, during the Relevant Period, PwC consistently provided Clean Audit opinions and consented to the inclusion of its report in the Company's SEC filings.  As evidence of this, the Company's Form 10-K for the period ended December 31, 2006 and filed with the SEC on or about February 27, 2007 stated, in part, the following:

Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of ArthroCare Corporation:

We have completed integrated audits of ArthroCare Corporation's consolidated financial statements and of its internal control over financial reporting as of December 31, 2006, in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements and financial statement schedule

In our opinion, the consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of ArthroCare Corporation and its subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to

obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for share-based compensation in 2006.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2006 based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance

with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As described in Management's Report on Internal Control Over Financial Reporting, management has excluded TiMax Surgical Pty. Ltd. (TiMax) from its assessment of internal control over financial reporting as of December 31, 2006 because TiMax was acquired by the Company in a purchase business combination during 2006. We have also excluded TiMax from our audit of internal control over financial reporting. TiMax is a wholly-owned subsidiary whose total assets and total revenues each represented less than one percent of the Company's consolidated total assets and consolidated total revenues as of and for the year ended December 31, 2006.

/s/ PricewaterhouseCoopers LLP
Austin, Texas
February 27, 2007

129.    Similarly, in the Company's Annual Report for the year ended December 31, 2007, filed with the SEC on or about February, 29, 2008, pursuant to Form 10-K, also contained an unqualified Report by PwC that stated, in part, the following:

To the Board of Directors and Stockholders of ArthroCare Corporation

In our opinion, the consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of ArthroCare Corporation and its subsidiaries at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective

internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for uncertain tax positions in 2007 and the manner in which it accounts for stock-based compensation in 2006.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
Austin, Texas
February 29, 2008

130.    The fact that ArthroCare has been caused to restate its financial statements is an admission by the Individual Defendants that the financial statements originally issued and certified by the Auditor Defendant were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by ArthroCare was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶ 7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶ 14.

131.    ArthroCare's restatement was not due to a change in reporting entity or a change in accounting principles, but rather due to errors in previously issued financial statements. Thus, the restatement is an admission by ArthroCare that its previously issued financial results and its public statements regarding those results were false.

132.    Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed, and is known by reasonably independent auditors acting within the scope of their audit functions and responsibilities, to be the type of information that is expected to be and must be disclosed.

IX.    **INSIDER TRADING.**

133.    Prior to the Individual Defendants' belated disclosure of the true, impaired financial and operational condition of the Company, these defendants published a series of

materially false and misleading statements and reports about the finances and operations of ArthroCare. The effect of these materially false and misleading statements was to artificially inflate the price of the Company's shares, at least long enough to allow insiders **Gluk, Baker, Christensen, Giroux, Raffle, and Sanchez** (the Insider Selling Defendants) to liquidate over $31 million of their personally held ArthroCare stock, while in possession of material, adverse, non-public information.

134.    Thus, between April 1, 2006 and July 21, 2008, during the height of Defendants' manipulation of its sales practices for spinal products, the Insider Selling Defendants made the following dispositions of Company stock based on their inside information:

| Date | Insider | Shares | Sale Price | Value |
|---|---|---|---|---|
| 29-Apr-08 | GLUK MICHAEL THOMAS Officer | 3,450 | $48.00 per share | $165,600 |
| 12-Mar-08 | CHRISTENSEN RICHARD A Officer | 2,200 | $35.99 per share | $79,178 |
| 11-Mar-08 | CHRISTENSEN RICHARD A Officer | 695 | $39.82 per share | $27,674 |
| 3-Mar-08 | GIROUX JOHN H Officer | 6,300 | $44.86 per share | $282,618 |
| 25-Feb-08 | GLUK MICHAEL THOMAS Officer | 162 | $41.09 - $41.11 per share | $6,656 |
| 19-Feb-08 | GLUK MICHAEL THOMAS Officer | 128 | $41.79 per share | $5,349 |
| 2-Jan-08 | GLUK MICHAEL THOMAS Officer | 1,150 | $48.09 - $49.35 per share | $55,493 |
| 5-Dec-07 | GIROUX JOHN H Officer | 417 | $55.00 per share | $22,935 |
| 3-Dec-07 | GLUK MICHAEL THOMAS Officer | 1,616 | $51.31 - $54.40 per share | $85,250 |
| 1-Nov-07 | GLUK MICHAEL THOMAS Officer | 1,150 | $64.93 - $65.50 per share | $75,240 |
| 1-Nov-07 | RAFFLE JOHN | 8,125 | $65.00 per share | $528,125 |

| | | | | |
|---|---|---|---|---|
| | THOMAS<br>Officer | | | |
| 1-Nov-07 | GIROUX JOHN H<br>Officer | 873 | $64.31 per share | $56,000 |
| 23-Oct-07 | RAFFLE JOHN<br>THOMAS<br>Officer | 19,298 | $60.00 - $62.00 per share | $1,177,000 |
| 23-Oct-07 | GIROUX JOHN H<br>Officer | 12,541 | $63.00 - $63.04 per share | $790,000 |
| 9-Oct-07 | RAFFLE JOHN<br>THOMAS<br>Officer | 4,380 | $60.00 per share | $263,000 |
| 3-Oct-07 | CHRISTENSEN<br>RICHARD A<br>Officer | 12,500 | $54.63 per share | $682,875 |
| 1-Oct-07 | GLUK MICHAEL<br>THOMAS<br>Officer | 1,150 | $56.04 - $56.45 per share | $64,508 |
| 1-Oct-07 | GIROUX JOHN H<br>Officer | 417 | $56.35 per share | $23,000 |
| 4-Sep-07 | GIROUX JOHN H<br>Officer | 417 | $55.75 per share | $23,000 |
| 4-Sep-07 | GLUK MICHAEL<br>THOMAS<br>Officer | 1,150 | $56.88 - $56.89 per share | $65,414 |
| 22-Aug-07 | BAKER MICHAEL A<br>Officer | 6,041 | $56.00 per share | $338,296 |
| 21-Aug-07 | BAKER MICHAEL A<br>Officer | 1,000 | $56.00 per share | $56,000 |
| 8-Aug-07 | RAFFLE JOHN<br>THOMAS<br>Officer | 6,322 | $58.00 per share | $367,000 |
| 7-Aug-07 | BAKER MICHAEL A<br>Officer | 13,332 | $56.00 - $56.07 per share | $746,656 |
| 7-Aug-07 | RAFFLE JOHN<br>THOMAS<br>Officer | 13,500 | $56.00 per share | $756,000 |
| 6-Aug-07 | GIROUX JOHN H<br>Officer | 900 | $55.00 per share | $50,000 |
| 3-Aug-07 | BAKER MICHAEL A<br>Officer | 20,000 | $54.00 - $54.02 per share | $1,080,002 |
| 3-Aug-07 | GIROUX JOHN H<br>Officer | 3,351 | $55.00 - $55.04 per share | $184,000 |
| 1-Aug-07 | GLUK MICHAEL<br>THOMAS<br>Officer | 1,150 | $49.88 - $50.00 per share | $57,482 |
| 30-Jul-07 | BAKER MICHAEL A | 20,000 | $52.00 per share | $1,040,000 |

| Date | Name | Shares | Price | Total |
|---|---|---|---|---|
| | Officer | | | |
| 30-Jul-07 | RAFFLE JOHN THOMAS<br>Officer | 9,922 | $52.00 per share | $516,000 |
| 27-Jul-07 | GLUK MICHAEL THOMAS<br>Officer | 2,000 | $48.60 per share | $97,200 |
| 27-Jul-07 | BAKER MICHAEL A<br>Officer | 19,582 | $50.00 - $50.02 per share | $979,110 |
| 27-Jul-07 | RAFFLE JOHN THOMAS<br>Officer | 83 | $48.60 per share | $4,033 |
| 26-Jul-07 | GLUK MICHAEL THOMAS<br>Officer | 1,450 | Sale at $48.00 per share | $69,600 |
| 26-Jul-07 | RAFFLE JOHN THOMAS<br>Officer | 1,556 | $48.00 per share | $75,000 |
| 29-May-07 | GIROUX JOHN H<br>Officer | 2,692 | $42.92 per share | $116,000 |
| 4-May-07 | RAFFLE JOHN THOMAS<br>Officer | 8,395 | $41.71 - $42.00 per share | $351,000 |
| 4-May-07 | CHRISTENSEN RICHARD A<br>Officer | 7,171 | $41.76 per share | $299,000 |
| 4-Apr-07 | GIROUX JOHN H<br>Officer | 1,333 | $37.43 per share | $50,000 |
| 23-Feb-07 | GIROUX JOHN H<br>Officer | 500 | $38.09 per share | $19,000 |
| 16-Feb-07 | GIROUX JOHN H<br>Officer | 800 | $38.03 per share | $30,000 |
| 14-Dec-06 | SANCHEZ FERNANDO V<br>Other | 3,175 | $41.64 per share | $132,000 |
| 4-Dec-06 | GLUK MICHAEL THOMAS<br>Officer | 433 | $42.12 per share | $18,238 |
| 15-Nov-06 | GIROUX JOHN H<br>Officer | 3,777 | $42.92 per share | $162,000 |
| 5-Oct-06 | GLUK MICHAEL THOMAS<br>Officer | 1,150 | $48.00 per share | $55,200 |
| 2-Oct-06 | BAKER MICHAEL A<br>Officer | 77,990 | $46.15 per share | $3,599,239 |
| 28-Sep-06 | GIROUX JOHN H | 4,609 | $47.03 - $47.17 per share | $217,000 |

| | | | | |
|---|---|---|---|---|
| | Officer | | | |
| 19-Sep-06 | GLUK MICHAEL THOMAS Officer | 150 | $48.00 per share | $7,200 |
| 18-Sep-06 | RAFFLE JOHN THOMAS Officer | 10,479 | $48.00 per share | $503,000 |
| 18-Sep-06 | GLUK MICHAEL THOMAS Officer | 3,300 | $48.00 per share | $158,400 |
| 28-Aug-06 | GIROUX JOHN H Officer | 4,607 | $44.72 - $44.92 per share | $206,000 |
| 14-Aug-06 | BAKER MICHAEL A Officer | 59,479 | $46.00 per share | $2,736,034 |
| 10-Aug-06 | BAKER MICHAEL A Officer | 20,521 | $46.00-$46.11 per share | $944,439 |
| 10-Aug-06 | GLUK MICHAEL THOMAS Officer | 1,150 | $46.00 per share | $52,900 |
| 8-Aug-06 | GIROUX JOHN H Officer | 18,748 | $44.94 per share | $842,000 |
| 28-Jul-06 | GIROUX JOHN H Officer | 127,106 | $42.93 per share | $5,457,000 |
| 1-May-06 | GLUK,MICHAEL THOMAS Officer | 150 | $46.00 per share | $6,900 |
| 4-Apr-06 | BAKER MICHAEL A Officer | 13,000 | $45.55 per share | $592,150 |
| 3-Apr-06 | GLUK, MICHAEL THOMAS Officer | 300 | $47.88 per share | $14,364 |
| 3-Apr-06 | BAKER MICHAEL A Officer | 67,000 | $47.15 per share. | $3,159,050 |
| | **TOTAL ALL INSIDERS** | **636,323** | | **$30,623,408** |

135.   At or before the time of these sales, each of these defendants well knew of ArthroCare's misconduct in manipulating its sales figures and financial results.

136.   The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the company.  In addition, it violated Merrill's corporate policy as contained in the Code of

Ethics.  Moreover, the sales were suspicious in timing and amount.  For example, defendant Baker sold 297,945 shares of his personally held shares of ArthroCare stock for proceeds of $15,270,926, constituting over 100 percent of his personal holdings of Company stock as of the date of first sale Gluk's sales of 21,061 shares constituted 55 percent of his holdings.  The Insider Selling Defendants' trading activities commenced shortly after ArthroCare's DiscoCare model was implemented and continued throughout the Relevant Period.

137.    Indeed, at the same time that many of the Insider Selling Defendants were selling their stock, ArthroCare itself was *buying* the stock.  In December 2007, ArthroCare's Board approved the repurchase of up to $75 million in stock on the open market.  That month, the Company repurchased 1,255,982 shares at an average price of $47.49.  The total cost was $59.6 million, and the Company had to borrow all of the money required to repurchase the shares.  During the first quarter of 2008, the Company repurchased 243,918 shares at a cost of $11.8 million.  (The Company has not released Forms 10-Q beyond the first quarter of 2008, so Plaintiff is not aware of what further repurchases, if any, have been made.)

## X.    DERIVATIVE ALLEGATIONS.

138.    Plaintiff brings this action derivatively in the right and for the benefit of ArthroCare to redress injuries suffered, and to be suffered, by ArthroCare as a direct result of the violations of federal and state law, breaches fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.

139.    ArthroCare is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff was a shareholder of ArthroCare at the time of the transaction complained of.  Plaintiff will adequately and fairly represent the interests of ArthroCare and its shareholders in

enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

140.   The wrongful acts complained of herein subject, and will continue to subject, ArthroCare to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

141.   The wrongful acts complained of herein were unlawfully concealed from ArthroCare's shareholders.

## XI.   DEMAND FUTILITY.

142.   Plaintiff has not made any demand on the Board of ArthroCare to institute this action since such demand would be a futile and useless act because the wrongful acts complained of show a wholesale abandonment by defendants of their fiduciary duties of due care and oversight. Such abandonment includes, but is not limited to:

(a)   allowing insiders to dispose shares before news of the Company's financial woes became known to investors;

(b)   allowing the Company to become engaged in and/or suspected of potentially illegal and fraudulent activities;

(c)   allowing for woefully inadequate controls over the Company's policies and practices with respect to revenue and/or sales recognition; and

(d)   allowing the Company's financial statements to be artificially inflated.

143.   These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

144.   Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered. That doctrine

carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation. Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

145.    As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and causing the Company to engage in illegal and/or improper conduct that rendered the Company's public disclosures misleading, destroying in their wake, much of the Company's shareholder value. The Director Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment. As such, demand is excused as futile.

146.    In addition, Defendant Baker will take no action against the remainder of the ArthroCare Board, and they will take no action against him, because defendant Baker is the Chairman of the Board of Directors and the former Chief Executive Officer of ArthroCare who dominated and controlled the Company during the Relevant Period, and who continues to dominate and control the Company as a result of his role as leading Board member of the Company. Defendant Baker will also take no action against the other members of the Board of Directors because he, together with the other senior managers of ArthroCare being sued herein, were directly responsible for the illegal acts and practices complained of herein, thus any pursuit demand upon the members of the Board of the Company to take the actions requested by Plaintiff herein must necessarily be excused.

147.   Defendant Baker will also take no action against the other ArthroCare Board members because he was responsible for selling at least 297,945 shares of his personally held shares of ArthroCare stock for proceeds of $15,270,926 while in possession of material adverse information about the Company during the Relevant Period and is now subject to insider trading liability for these well-timed stock sales.  Accordingly, demand is excused against defendant Baker;

148.   Moreover, by virtue of their respective positions on the Board, all the Director Defendants, including but not limited to defendant Baker, either knew of should have known about the improper accounting practices and/or the potentially fraudulent billing practices of the Company's agent, or they abdicated all oversight over the policies and practices of the Company, which created an environment in which the senior management could implement policies that placed the success and growth of the company upon improper revenue recognition and/or fraudulent "upcoding" by end-users.  Therefore, a majority of the Board are either directly responsible for the Company's practices or were derelict in carrying out the express oversight duties with which they were charged.  As such, demand is excused as futile.

149.   Furthermore, defendants Fitzgerald, Wilson, Lendau and Geremski (a majority of the Board) as members of the Audit Committee during the Relevant Period, and defendant Baker as President and CEO during the Relevant Period (a fifth member of the seven member Board) were responsible for ensuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate.  Thus, the Audit Committee was directly responsible for approving, and the President and CEO was a signature to, the Company's materially false and misleading financial statements.  Therefore, there is significant doubt that these five Director Defendants are disinterested because they face a substantial likelihood of liability for their braches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as

other violations of law.  As such, the defendants Baker, Fitzgerald, Wilson, Lendau and Geremski are not disinterested or independent, and are not capable of responding adequately to a demand. Demand on them is therefore excused.

150.    Indeed, the adoption of the Sarbanes-Oxley Act also placed significant additional responsibilities on the Board of Directors of ArthroCare, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure. Thus, despite the ArthroCare Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with the Sarbanes-Oxley act, in fact, at all relevant times, defendants had caused or allowed defendants to falsify the Company's reported financial results. Any real compliance with Sarbanes-Oxley, however, would have exposed defendants' scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board of ArthroCare did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

151.    Demand upon the Board of ArthroCare that that they sue themselves for the damage that their misconduct has caused the Company would prove futile and useless, and it is obvious that defendants will not do so, and they have not done so. A primary reason that the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability, and demand on them is therefore excused.

152.    Moreover, while ArthroCare and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director

oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and demand on them is therefore excused.

153.    In addition, and as a result of their concealments and falsifications, many of the directors and managers of ArthroCare held onto their positions of power, prestige and profit at the Company.  The managers of ArthroCare obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

154.    Moreover, defendants Baker, Foster, and Lendau are former employees of Medtronic and have close social and personal relationships as a result of that experience, precluding them from acting independently of another.

155.    Furthermore, the ArthroCare Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of ArthroCare or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)    The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)    In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)    The members of the ArthroCare Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of ArthroCare. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)    The ArthroCare directors' and officers' liability insurance policies for the Relevant Period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

156.   Demand must also be excused as to all of the members of the Board of Directors of the Company because each member of the Board either knew or was reckless or negligent in not knowing of the illegal and improper sales practices that were sanctioned and approved at the Company throughout the Relevant Period.  Defendants will now take no action against the other members of the Board of Directors of ArthroCare because each of the defendants engaged in or allowed ArthroCare to engage in illegal and improper sales practices involving its spinal surgery devices.

157.   Finally, demand is also excused because the Board has already failed, in the face of several investigative reports, to address the transactions challenged herein.  The Board has thus been made aware of the improper conduct and has failed to even investigate it.  This repeated resistance to correcting, or even investigating, improper conduct demonstrates that a demand on the Board to take action would be futile.

158.   Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

159.   Moreover, each of the Individual Defendants, as a longstanding Officer or Director of ArthroCare, had intimate knowledge of all major operations of the Company, and yet he participated in dissemination of material misstatements of the Company's financial information.  Thus, the Individual Defendants all have a personal interest in concealing any blame for ArthroCare's internal control problems, and away from himself for consciously disregarding fiduciary duties.  An investigation or inquiry that spread blame higher up the corporate ladder — to the Officers or

Directors — would not be in the personal interest of the Individual Defendants. The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

160.    Additionally, all of the Individual Defendants face a sufficiently substantial likelihood of liability,[5] and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

161.    Defendants will not take the action requested by plaintiffs herein, because to do so would expose the Insider Selling Defendants to liability for over $26 million in illegal and improper insider stock sales. In addition to the civil liability alleged herein, the Selling Defendants could also be subjected to criminal liability for the same illegal and improper conduct.

## COUNT I

### Derivatively Against Defendants Baker and Gluk for Disgorgement Under the Sarbanes-Oxley Act of 2002

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    Section 304 of SOX provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives. Specifically, Section 304 of SOX, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

(a)    **Additional compensation prior to noncompliance with commission financial reporting requirements.** If an issuer is required to prepare an accounting

---

[5] Indeed, the liability of the Individual Defendants could even include criminal fraud if the billing of private third-party insurance companies by DiscoCare is determined to constitute insurance fraud.

restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –*

      1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

      2.    any profits realized from the sale of securities of the issuer during that 12-month period.

(b)    **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

164.    ArthroCare has restated its financial statements due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of SOX.  As a result, defendant Baker as ArthroCare's CEO and defendant Gluk as ArthroCare's CFO are required to reimburse ArthroCare for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period from January 1, 2006 through July 21, 2008.

165.    Further, defendants Baker and Gluk are liable to ArthroCare for any profits realized from the sales of securities by the Company during that same period of time.

166.    Defendants Baker and Gluk are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of ArthroCare.

## COUNT II

### Derivatively Against the Baker, Gluk, and the Insider Selling Defendants
### for Violation of  §10(b) of the Exchange Act  and Rule 10b-5 Promulgated Thereunder

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    During the Relevant Period, defendants Baker and Gluk disseminated or approved financial statements that did not disclose accounting inaccuracies and internal control problems at

ArthroCare enumerated above. Specifically, ArthroCare's financial statements included financial results that did not properly account for income, revenue, sales and/or sale commissions as required by GAAP. These defendants knew and recklessly disregarded the fact that the Company's financial statements were misleading due to the inaccurate accounting in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.    The Insider Selling Defendants also sold 636,323 shares of ArthroCare's common stock at inflated prices between 2006 and the present, receiving over $30.6 million in proceeds, while in possession of material, non-public information.   These defendants misappropriated ArthroCare's proprietary information and violated their "abstain or disclose" duties under the federal securities laws when they sold ArthroCare stock without disclosing the information alleged to have been concealed herein.

170.    As such, the above named defendants violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon ArthroCare and others in connection with their purchases of ArthroCare common stock during the Relevant Period.

171.    As a result of these defendants' misconduct, ArthroCare has suffered and will suffer damages in that it paid artificially inflated prices for ArthroCare common stock purchased on the

open market.  ArthroCare would not have purchased ArthroCare common stock at the prices it paid

had the market been aware that the market price of ArthroCare's stock was artificially and falsely

inflated by defendants' misleading statements.

172.    As a direct and proximate result of these defendants' wrongful conduct, ArthroCare

suffered damages in connection with its purchases of ArthroCare common stock during the Relevant

Period.

173.    By reason of such conduct, these defendants are liable to the Company pursuant to

§10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT III

### Derivatively Against All Defendants for Breach of Fiduciary Duty

174.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

175.    The Individual Defendants owed and owe ArthroCare fiduciary obligations.  By

reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and

owe ArthroCare the highest obligation of good faith, fair dealing, loyalty and due care.

176.    The Individual Defendants, and each of them, violated and breached their fiduciary

duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

177.    Each of the Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly misrepresent the financial results of the Company and failed to

correct the Company's publicly reported financial results and guidance.  These actions could not

have been a good faith exercise of prudent business judgment to protect and promote the Company's

corporate interests.

178.    The Individual Defendants caused or allowed ArthroCare to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

179.    The Individual Defendants caused or allowed the Company's financial statements to be materially misstated due to the Individual Defendants' failure to properly defer income and royalty payments and their improper capitalization of royalty expenses.

180.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

181.    The Individual Defendants caused or allowed financial statements to be materially misstated.

182.    The Individual Defendants caused or allowed the Company's revenue and income to be overstated from March 31, 2000 through July 21, 2008 due to those problems.

183.    Based on the foregoing, the Individual Defendants caused or allowed ArthroCare's Relevant Period financial statements to be materially misleading and not prepared in accordance with GAAP principles.

184.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ArthroCare has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### COUNT IV

### Derivatively Against the Individual Defendants for Abuse of Control

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ArthroCare, for which they are legally responsible. Among the

abuses of control was: (i) the Individual Defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving, the Company's financial statements, as well as the Company's sales agent DiscoCare; and (ii) the Individual Defendants' causing, allowing and/or participating in illegal stock sales by insiders while they were in possession of the material, adverse, non-public information about the Company's accounting problems.

187.     As a direct and proximate result of the Individual Defendants' abuse of control, ArthroCare has sustained significant damages.

188.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### Derivatively Against the Individual Defendants for Gross Mismanagement

189.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ArthroCare in a manner consistent with the operations of a publicly held corporation.

191.     The Individual Defendants caused or allowed ArthroCare to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

192.     The Individual Defendants caused or allowed the Company's financial statements to be materially misstated due to the Individual Defendants' failure to properly recognize income.

193.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company Financial Statements, as well as the Company's sales agent DiscoCare.

194.    The Individual Defendants caused or allowed financial statements to be materially misstated.

195.    The Individual Defendants, and the members of the Audit Committee in particular, did not take seriously their primary responsibility for the Company's financial statements.

196.    The Individual Defendants caused or allowed the Company's revenue and income to be overstated from at least January 1, 2000 through July 21, 2008 in connection with those improprieties.

197.    Based on the foregoing, the Individual Defendants caused or allowed ArthroCare's Relevant Period financial statements to be materially misleading and not prepared in accordance with GAAP.

198.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ArthroCare has sustained significant damages in excess of hundreds of millions of dollars.

199.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT VI

### Derivatively Against the Individual Defendants for Waste of Corporate Assets

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the